735 F.2d 32
 Basseter AUGUSTIN, Petitioner-Appellant,
v.
Charles C. SAVA, District Director of the New York District
of the Immigration and Naturalization Service, and Kevin
Doyle, Deputy Assistant Director For Detention and
Deportation of the Immigration and Naturalization Service,
Respondents-Appellees.
 No. 815, Docket 83-2326.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 23, 1984.
Decided May 22, 1984.
 
 Robert B. Calihan, New York City (Richard E. Simpson, New York City, on the brief), for petitioner-appellant.
 Michael P. DiRaimondo, Sp. Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., and Miles M. Tepper, Asst. U.S. Atty., Brooklyn, N.Y., on the brief), for respondents-appellees.
 Before TIMBERS, NEWMAN and KEARSE, Circuit Judges.
 TIMBERS, Circuit Judge:
 
 
 1
 Haitian refugee Basseter Augustin appeals from two orders entered on July 15, 1983 and August 26, 1983, and from the judgment entered thereon, in the Eastern District of New York, Eugene H. Nickerson, District Judge, denying his petition for a writ of habeas corpus which sought judicial review of an order of exclusion and deportation.
 
 
 2
 The district court, in rejecting appellant's claim that his due process rights had been violated, held that entering aliens have few, if any, due process rights; that in this case a meaningful application for asylum was not made "utterly impossible"; and that the Immigration Judge (IJ) did not abuse his discretion in denying a continuance. The court also rejected appellant's claim that he should have been placed in deportation proceedings rather than exclusion proceedings, holding that such claim had not been presented to the IJ or the Board of Immigration Appeals (BIA) and therefore had been waived.
 
 
 3
 This appeal raises important issues with respect to the procedural rights of aliens, including particularly the judicial duty to scrutinize the scope and accuracy of translations of immigration administrative proceedings. We hold that Augustin's procedural rights were violated by the inadequate translation of his hearing before the IJ. We remand to the district court with instructions to grant the writ unless a renewed asylum request is properly processed.
 
 I.
 
 4
 Haitians began to arrive in the United States in the early 1970s. Over the last ten years, around 40,000 have come to the United States, some fleeing political persecution and some fleeing destitution. Attempting to sort out the genuine claims of persecution which justify political asylum has been a difficult task. The attempt has generated much litigation.
 
 
 5
 Augustin claims that he came to this country to escape political persecution directed at himself and his family by paramilitary forces of the Haitian government. He alleges that his cousin, Benjamin Janvier, angered the Tonton Macoutes by having one of their members arrested for the suspected poisoning of his father (Augustin's uncle).[1] Janvier was severely beaten during his six month imprisonment. He further angered the government by refusing, upon his release, to return to his former post with the Leopards, another paramilitary group.
 
 
 6
 Thereafter, Augustin's entire family was placed under surveillance, threatened, and periodically arrested. In response, Augustin and Janvier initiated political activities against the Duvalier regime. They formed a local opposition group which challenged the Tonton Macoutes and they participated in secret martial arts classes. Augustin was detained and interrogated at Casearnes Arsenal on February 8, 1981. He went into hiding several months after his release because he learned that the Haitian Army had arrested three other members of his family and was looking for him and Janvier. The Army located Janvier and had him arrested.
 
 
 7
 On August 25, 1981, Augustin left Haiti in a small boat. The boat sank off the Florida coast on October 26, 1981. Thirty-three passengers (including Augustin's sister) drowned. Augustin was carried by the current to the beach. He attempted to help others involved in the sinking and then began walking into town. He was arrested as he approached a Miami sidewalk with others from the boat. After his arrest and initial processing by the Immigration and Naturalization Service (INS), he was taken to Krome Detention Center near Miami where he was held for nine months pursuant to an INS detention program. Pro bono counsel Magda Montiel Davis was assigned to Augustin pursuant to a consent decree forbidding exclusion or deportation of Haitian refugees not represented by counsel. Louis v. Meissner, 530 F.Supp. 924, 930 (S.D.Fla.1981).
 
 
 8
 Since Ms. Davis spoke no Creole and Augustin spoke no English, preparation for the hearing and the asylum petition required the services of a translator. According to Ms. Davis, the INS promised to provide translating services but failed to do so at critical times.[2] At other times it provided a translator who appears to have been inadequate. The asylum form filed by Augustin and relied upon by the IJ, the BIA, and the State Department reflects the translator's misinterpretation that Augustin fled Haiti for fear of arrest because his uncle had a "disease". Further interrogation of Augustin following the BIA hearing and his affidavit of April 13, 1983, however, make it clear that this "disease" theory was not the substance of his claim.
 
 
 9
 At the exclusion hearing held on July 7, 1982, Ms. Davis requested a continuance to allow her to obtain the material she needed from the translating service and adequately to prepare the petition for asylum. She recited the failure of the translating service to send the translated letter or answers and its failure to appear for a meeting with her and Augustin as justification for the continuance.[3] INS did not oppose the continuance application.
 
 
 10
 The IJ, however, denied the application, stating to Ms. Davis that "the Court will not be a party to keeping [Augustin] in further incarceration, and that is all I would be doing by putting this off." He told Ms. Davis that she could question her client before him and that his answers would be made a part of the record. Ms. Davis stated that she did not know who to call as witnesses to substantiate the political persecution claim. The IJ responded that perhaps there were no witnesses to call.[4] Faced with this situation, Ms. Davis announced that she was withdrawing from representing Augustin at the exclusion hearing.
 
 
 11
 The IJ proceeded to question Augustin about his excludability. He asked him if he was a citizen of Haiti, when he arrived, how he arrived, whether he intended to remain in the United States for an indefinite period of time, and whether he had any papers issued by the United States. For aught that appears in the record before us, only these questions and Augustin's answers, together with some statements from the IJ to Augustin, were translated into Creole. The withdrawal of counsel and the denial of the continuance were not translated. In addition to the limited scope of the translation, there is evidence of deficiencies in the translator's ability to translate.[5] The translator's inattention toward translating became so apparent that the IJ directly questioned the translator as to whether he was repeating the IJ's words. When Augustin was asked if he was a native of Haiti, the translator translated his answer as "I am not married yet, but I know I am the Haitian." When Augustin was asked if he had anything to add, the translated response was "He said because I said everything before and then I have nothing to say today. I will come back again here to call me for the other hearing." The IJ, through the translator, could not make Augustin understand that this was the final hearing. Indeed, it is difficult to assess the extent of the translator's accuracy because many long and complex questions by the IJ were answered by Augustin with an ambiguous "yes".[6]
 
 
 12
 The IJ also asked about the asylum claim. At this point, Ms. Davis told the IJ that she had instructed Augustin not to answer. The IJ announced that he would rely solely on material already in the record with respect to the asylum claim.
 
 
 13
 In an oral decision at the conclusion of the hearing on July 7, 1982, the IJ denied appellant's petition for political asylum on the ground that he had not established a well-founded fear of persecution within the meaning of 8 U.S.C. Sec. 1253(h)(1) (1982). On January 28, 1983, the BIA affirmed. It rejected Augustin's claim that he had been denied effective assistance of counsel and the right to present evidence. It held that denial of the continuance was justified because Ms. Davis had not shown that she could not have been prepared to proceed with Augustin's claim by the time of the exclusion hearing and that she had not shown actual prejudice.
 
 
 14
 On March 22, 1983, appellant was served with a notice requiring him to surrender on April 14, 1983. He filed a petition for a writ of habeas corpus in the Eastern District of New York on April 13, 1983, seeking judicial review of the order of exclusion and deportation.[7]
 
 
 15
 On June 24, 1983, in a written decision and order, Judge Nickerson denied the petition. He held that the IJ did not abuse his discretion or deny appellant due process by denying his request for a continuance, and that Augustin had waived his claim that he should have been placed in deportation proceedings rather than exclusion proceedings by failing to raise that claim before the IJ or BIA. A motion to amend that decision and order was denied on August 19, 1983 except for a minor correction.
 
 
 16
 From the judgment entered on the district court's orders, the instant appeal has been taken. Appellant claims that his statutory and due process rights have been violated.
 
 II.
 
 17
 The power to admit or exclude[8] aliens is a fundamental sovereign attribute.[9] An alien who petitions for initial admission to the United States is requesting a privilege. E.g., Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 216 (1953). But an alien who is present in the United States, even illegally, is entitled to constitutional protections.[10] See, e.g., Mathews v. Diaz, 426 U.S. 67, 77 (1976). Rather than forcing an alien to remain outside the United States while a petition for admission is pending, the courts, although unwilling to grant constitutional protection to such petitioners, have created an "entry doctrine" fiction. An unofficial entry is permitted which has no effect on the "unadmitted" alien's status, because it does not constitute a legal entry even though the alien is physically present in the United States. Leng May Ma v. Barber, 357 U.S. 185, 188 (1958).[11]
 
 
 18
 Although aliens who petition for admission have no constitutional rights regarding their applications,[12] they do have such statutory rights as Congress grants. The Immigration and Nationality Act, as amended by the Refugee Act of 1980, 8 U.S.C. Sec. 1101 et seq. (1982), and federal regulations promulgated thereunder, afford certain procedural and substantive entitlements to excludable aliens. Under 8 U.S.C. Sec. 1226(a), an alien who seeks entry is entitled to a hearing before an Immigration Judge on the validity of his application. At the hearing the alien has the right to present evidence, to cross-examine witnesses, and to examine and object to evidence offered against him. 8 C.F.R. Sec. 236.2(a) (1983). He has the right to counsel. 8 U.S.C. Sec. 1362. Most pertinent to Augustin's case, the INS regulations contemplate that proceedings and documents in a foreign language will be accurately translated. 8 C.F.R. Sec. 242.12 ("Any person acting as interpreter ... shall ... translate accurately"); id. Sec. 103.2 ("A foreign document must be accompanied by an English translation .... The translator must certify ... that the translation is accurate"). These procedural protections plainly apply to hearings on applications for asylum. Although a grant of asylum is discretionary,[13] the Act creates a right to petition for such relief.[14] Congress clearly intended to " 'grant aliens the right to submit and the opportunity to substantiate their claim for asylum.' " Jean v. Nelson, supra note 5, 727 F.2d at 982, (quoting Haitian Refugee Center v. Smith, supra, 676 F.2d at 1038).
 
 
 19
 Moreover, these elemental procedural protections may well be required not only by the pertinent statutes and regulations but also by the due process clause of the Fifth Amendment. In the absence of protected interests which originate in the Constitution itself, constitutionally protected liberty or property interests may have their source in positive rules of law creating a substantive entitlement to a particular government benefit. E.g., Meachum v. Fano, 427 U.S. 215, 226 (1976). In such a case, limited due process rights attach. E.g., Wolff v. McDonnell, 418 U.S. 539, 577 (1974). 8 U.S.C. Sec. 1253(h) prohibits the Attorney General from deporting or returning an alien to a country in which his life or freedom would be jeopardized. This statute creates a substantive entitlement to relief from deportation or return to such a country. Thus, despite the unavailability of due process protections in most exclusion proceedings, see Landon v. Plasencia, supra, and whether or not due process protections apply to an application for a discretionary grant of asylum, which secures admission to this country, compare Jean v. Nelson, supra note 5 (no due process rights) with id. at 989-90 (Kravitch, J., dissenting in part) (some due process rights), it appears likely that some due process protection surrounds the determination of whether an alien has sufficiently shown that return to a particular country will jeopardize his life or freedom so as to invoke the mandatory prohibition against his return to that country. As we recently observed, an alien's "interest is not being returned [to a country where he fears persecution] may well enjoy some due process protection not available to an alien claiming only admission." Chun v. Sava, 708 F.2d 869, 877 (2 Cir.1983).
 
 
 20
 The requirements of the due process clause are flexible and dependent on the circumstances of the particular situation examined. E.g., Hewitt v. Helms, 459 U.S. 460, 472 (1983). Without attempting precisely to map the contours of due process in the immigration area, we think that the protected right to avoid deportation or return to a country where the alien will be persecuted warrants a hearing where the likelihood of persecution can be fairly evaluated. Since Congress intended this right to be equally available to all worthy claimants without regard to language skills, we think that an applicant for relief under Sec. 1253(h) must be furnished with an accurate and complete translation of official proceedings. As a sequel to this right, translation services must be sufficient to enable the applicant to place his claim before the judge. A hearing is of no value when the alien and the judge are not understood. Gonzales v. Zurbrick, 45 F.2d 934, 937 (6 Cir.1930).[15] The very essence of due process is a "meaningful opportunity to be heard". Hewitt, supra, 459 U.S. at 490 (Stevens, J., dissenting). To erect barriers by requiring comprehension of English would frustrate the inclusive aim of the UN Protocol and the intent of Congress.
 
 
 21
 If Augustin understood English, he would have realized that his asylum application did not state his true claim. This in turn might well have induced him to place his complete claim on the record, particularly if he had understood that this was the final hearing and his last opportunity to substantiate his claim.[16] Knowledge that his attorney had "withdrawn" from the proceeding because the IJ failed to grant a continuance also might have shaped his conduct differently.
 
 
 22
 We hold that appellant was denied procedural rights protected by statute and INS regulations and very likely by due process as well where the translation of the asylum application was nonsensical, the accuracy and scope of the hearing translation are subject to grave doubt, appellant misunderstood the nature and finality of the proceeding, and a credible claim which developed following translation was not reviewed. See Gonzales v. Zurbrick, supra (inadequate translation in deportation hearing); see also United States ex rel. Negron v. New York, 434 F.2d 386 (2 Cir.1970) (inadequate translation in state court criminal trial). Augustin's true claim has not been given any scrutiny, either by the Board of Immigration Appeals or the State Department. We agree with the Ninth Circuit that "[i]t is particularly important that an applicant for relief under 243(h) have a reasonable opportunity to present his proofs, for the stakes are high." Kovac v. INS, 407 F.2d 102, 108 (9 Cir.1969).
 
 
 23
 We reverse and remand to the district court with instructions to release Augustin from custody unless within sixty days the INS affords him an opportunity to initiate a new asylum application and affords him a hearing, with counsel, in conformity with applicable statutes and regulations and in accordance with this opinion.
 
 
 24
 The mandate shall issue forthwith.
 
 
 25
 Reversed and remanded.
 
 
 
 [1]
 The Tonton Macoutes (Volontaires de la Securite Nationale) are paramilitary forces supporting Haitian President Jean Claude Duvalier. They frequently are held responsible for illegal arrests and extrajudicial executions. As one court has stated, the Tonton Macoutes "did indeed make persons disappear. The bad persons visited by the Macoutes, however, were not criminals, but enemies of Duvalier.... [V]irtually any encounter with a member of the security forces is a political encounter." Haitian Refugee Center v. Civiletti, 503 F.Supp. 442, 497, 500 (S.D.Fla.1980), modified sub nom. Haitian Refugee Center v. Smith, 676 F.2d 1023 (5 Cir.1982)
 
 
 [2]
 Ms. Davis claims that twice before the exclusion hearing she gave the translator a set of written questions for Augustin, to be returned with his answers. The service repeatedly promised (up to the day before the hearing) to send Ms. Davis the translated answers, but never did so. The service also failed to deliver to Ms. Davis its translation of a letter from Augustin providing information relevant to the asylum claim
 
 
 [3]
 Ms. Davis also says that her ability to prepare was impaired because background materials which the Dade County Bar Association (sponsor of the pro bono representation program) had promised to send arrived only the day before the scheduled hearing
 
 
 [4]
 Appellant has since produced a list of witnesses presently in the United States
 
 
 [5]
 Our Court is not the first to be concerned with the ability of Creole translators in Haitian immigration proceedings. In Jean v. Nelson, 711 F.2d 1455, 1463 (11 Cir.1983), vacated, 727 F.2d 957 (11 Cir.1984) (en banc), the Eleventh Circuit stated that "[o]verwhelming evidence established that Creole translators were so inadequate that Haitians could not understand the proceedings nor be informed of their rights." See Louis v. Meissner, supra, 530 F.Supp. at 927
 
 
 [6]
 To compound our difficulty, we are unable to verify the accuracy of the translations because apparently there are no tapes or Creole transcriptions
 
 
 [7]
 An alien may challenge a final order of exclusion in a United States District Court by filing a petition for a writ of habeas corpus. 8 U.S.C. Sec. 1105a(b) (1982)
 
 
 [8]
 Aliens who have reached the United States border but have not been formally admitted (even though they in fact may be physically present in the United States) are "excludable" or "unadmitted" aliens and are processed in exclusion proceedings. The fiction that aliens present in the United States have not "entered" is called the "entry doctrine". Aliens who have effected an entry, whether legal or illegal, are "deportable" or "resident" aliens and are processed in deportation proceedings
 
 
 [9]
 Although courts hesitate to intervene in this area, judicial review nevertheless is appropriate to determine "whether the statutory procedures which govern exclusions have been observed and whether [petitioner] has been accorded a fair hearing thereunder." United States ex rel. Shung v. Murff, 176 F.Supp. 253, 257 (S.D.N.Y.1959), affirmed per curiam, 274 F.2d 667 (2 Cir.1960)
 
 
 [10]
 Since Augustin effected an illegal entry in Florida before he was detained, he arguably is a member of this class. Immigration officials placed him in an exclusion proceeding, however, and counsel failed to raise this argument before the IJ or the BIA. Thus it has been waived. Der-Rong Chour v. INS, 578 F.2d 464, 468 (2 Cir.1978), cert. denied, 440 U.S. 980 (1979)
 
 
 [11]
 The ironic result of this "entry doctrine" fiction is that illegal entrants are accorded many more procedural and substantive rights than aliens who properly petition for entry
 
 
 [12]
 See Landon v. Plasencia, 459 U.S. 21, 32, (1982)
 
 
 [13]
 8 U.S.C. Sec. 1158(a) provides that an alien "may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of [8 U.S.C. Sec. 1101(a)(42)(A) ]."
 
 
 [14]
 In Haitian Refugee Center v. Smith, supra, the Fifth Circuit held that due process protection attached to the right to petition for asylum. 676 F.2d at 1038. But see Jean v. Nelson, supra note 5, 727 F.2d at 982 n. 34. (disavowing any language in Haitian Refugee Center that might be read to suggest that excludable aliens have constitutional rights under the Fifth Amendment with regard to applications for admission or asylum)
 
 
 [15]
 But see Kaoru Yamataya v. Fisher [The Japanese Immigrant Case], 189 U.S. 86, 101-02 (1903)
 
 
 [16]
 The INS argues that Augustin was given every opportunity to present his asylum claim, but that he and his counsel strategically decided that they would not attempt to prove the merits of that claim. We are not persuaded by this argument. First, it is difficult to fathom what strategic purpose there could be in silence. The burden of substantiating a claim for asylum rests on the petitioner. The instant asylum application clearly was insufficient to meet that burden. Second, Augustin's ability to make such a strategic judgment clearly was jeopardized when his attorney had "withdrawn," and her discussion with the IJ and his denial of a continuance were not translated into Creole