**Jesus GUTIERREZ, Petitioner,**

v.

**David ILCHERT, District Director, Immigration and Naturalization Service, Respondent.**

**No. C–88–0585 EFL.**

United States District Court, N.D. California.

Aug. 19, 1988.

Walter Rafael Pineda, San Francisco, Cal., for petitioner.

George C. Stoll, Asst. U.S. Atty., San Francisco, Cal., for respondent.

## MEMORANDUM DECISION

LYNCH, District Judge.

On March 28, 1988, after hearing argument in this habeas corpus action, the Court remanded the case to respondent District Director for reconsideration of the decision to deny parole to petitioner Gutierrez. When the District Director again denied parole, Gutierrez renewed his petition in this Court. On May 6, 1988, the Court granted Gutierrez's request for a writ of habeas corpus and ordered the District Director to release Gutierrez on parole into the United States. The present opinion will serve to explain the reasons for the Court's decision.

## BACKGROUND

Since this Court detailed the underlying facts of this case in its March 28 order, it is unnecessary to repeat them in full here. A brief summary will suffice. Gutierrez, who is presumably a Mexican national, resided in this country for nine years, apparently without documentation. He was gainfully employed and started a family during that time. He is now the father of two United States citizens.

In May 1987, Gutierrez departed the United States to visit his ailing mother in Mexico. Approximately three weeks later, he attempted to reenter this country using counterfeit documentation. The Immigration and Naturalization Service ("INS") apprehended him and took him into custody.

While exclusion and deportation proceedings were pending, Gutierrez repeatedly applied for parole, partly on the ground that he intended to seek amnesty under the Immigration Reform and Control Act ("IRCA"). The District Director denied all the requests. In rejecting Gutierrez's application for amnesty as a basis for parole, the District Director concluded that Gutierrez was not eligible for amnesty due to his three week absence from the United States. He reached this conclusion largely on the basis of INS regulations interpreting IRCA's "brief, casual and innocent departure" exception to the continuous physical presence requirement normally applied to amnesty applicants.

Gutierrez petitioned for a writ of habeas corpus.[1] This Court concluded that the

---

1. In its earlier opinion, this Court expressed concern over the appropriate vehicle for judicial review of the parole decision. *See Gutierrez v. Ilchert*, 682 F.Supp. 467, 469 (N.D.Cal.1988). Gutierrez sought review pursuant to the general habeas corpus statute, 28 U.S.C. § 2241. However, 8 U.S.C. § 1252(a) provides that courts may review "any determination of the Attorney General concerning, detention, release on bond, or parole pending final decision of deportability upon a conclusive showing in habeas corpus proceedings that the Attorney General is not proceeding with … reasonable dispatch…." This Court found the latter section applicable and therefore preemptive of review under section 2241.

Upon further examination, however, it is unclear whether this was correct. Section 1252(a) applies to parole decisions pending the outcome of "deportability" proceedings. Gutierrez, however, is presently subject to "exclusion" proceedings. The distinction is technical but, at least in some other contexts, significant. *See Leng May Ma v. Barber*, 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1957); *see generally*, Comment, Deportation and Exclusion: A Continuing Dialogue Between Congress and the Courts, 71 *Yale Law Journal* 760, 761 n. 8. (1962). It hinges on whether the alien has "entered" the country. If he or she has entered, either legally or illegally, deportation is the proper proceeding. *See Augustin v. Sava*, 735 F.2d 32 (2d Cir.1984). Otherwise, only exclusion proceedings are appropriate. *Id.*

Unfortunately, Congress sometimes uses the word "deportation" in its nontechnical sense, referring to the return of aliens excluded from the country. *See Leng May Ma*, 357 U.S. at 187, 78 S.Ct. at 1073. Thus the applicability here of the section 1252(a) judicial review provision depends on whether the word "deportability" is used in its technical or nontechnical sense. In either event, however, jurisdiction is proper, since section 2241 would permit review if section 1252(a) does not apply.

regulation relied upon by the District Director was inconsistent with IRCA and therefore invalid. *See Gutierrez v. Ilchert,* 682 F.Supp. 467 (N.D.Cal.1988).[2] Accordingly, the Court remanded the case to the District Director, allowing him two weeks to reconsider the parole decision in light of the Court's ruling that the relevant INS regulation was invalid. Under the terms of the remand, Gutierrez was to be released if the District Director did not reach a decision within the two-week period.

Two weeks after issuance of the decision, the parties submitted a stipulation in which the District Director agreed to release Gutierrez on $1,000 bond if the Court would withdraw its opinion striking the INS regulation. The Court refused to withdraw the opinion, but granted the District Director three more days to reconsider his parole decision. Three days later, the District Director issued a 21–page decision, again denying parole. Gutierrez renewed his habeas corpus petition, arguing that the District Director (1) failed to comply with this Court's order; and (2) failed to supply a facially legitimate reason for his decision. For the reasons stated below, this Court agrees.

## DISCUSSION

A. *Standard of Review*

As this Court noted in its earlier opinion, the proper standard of review in judicial challenges to immigration parole decisions is unsettled. Some circuits review such decisions for an abuse of discretion, *see Moret v. Karn,* 746 F.2d 989 (3d Cir.1984); *Ahrens v. Masferrer Rojas,* 292 F.2d 406 (5th Cir.1961), while others apply the more deferential standard requiring only a "facially legitimate and bona fide reason" for the decision, *see Amanullah v.*

*Nelson,* 811 F.2d 1, 10 (1st Cir.1987); *Bertrand v. Sava,* 684 F.2d 204, 212 (2d Cir. 1982). The issue is open in the Ninth Circuit.

While this Court is uncertain whether the two standards are meaningfully different, the reasoning adopted in *Bertrand,* calling for greater deference, is persuasive. *Bertrand* looked to *Kleindienst v. Mandel,* 408 U.S. 753, 769–70, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972), for guidance on this issue. *Bertrand,* 684 F.2d at 212. In *Kleindienst,* the Court considered the appropriate level of judicial scrutiny of a Justice Department decision to deny a discretionary waiver of a particular ground of exclusion. *Kleindienst* noted that the Attorney General, when acting pursuant to discretion committed to him by Congress, exercises some part of Congress' plenary power to make policies and rules in connection with the exclusion of aliens. *Id.* Consequently, the Court concluded the exercise of this power should not be overturned if it rests on a "facially legitimate and bona fide reason." *Id.* 408 U.S. at 770, 92 S.Ct. at 2585.

Although the discretion exercised here is not identical to that at issue in *Kleindienst,* it is analogous in the important respect that it was a delegation of Congress' power to make policies and rules in connection with the exclusion of aliens. Accordingly, this Court, like the *Bertrand* court, concludes that the appropriate standard is the "facially legitimate and bona fide reason" standard applied in *Kleindienst.*

B. *The Merits*

As the District Director points out, section 1225(b) of U.S.C. Title 8[3] requires that the INS detain "for further inquiry" any

---

**2.** Three weeks after this Court's decision, the Eastern District of California reached the same conclusion and enjoined enforcement of the regulation. *See Catholic Social Services, Inc. v. Meese,* 685 F.Supp. 1149 (E.D.Cal.1988). However, while this Court had treated the regulation as recognizing absences as within the exception when they were either beyond the alien's control or authorized in advance by the INS, the court in *Catholic Social Services* interpreted the regulation to allow absences only in the latter

circumstance. Based on the text of the regulation, the *Catholic Social Services* court's interpretation appears to be correct. *See* 8 C.F.R. § 245a.1(g). This Court's treatment of the regulation was based on the interpretation applied by the District Director in this case.

**3.** Unless otherwise specified, all statutory references are to U.S.C. Title 8.

individual suspected of attempting to enter the country unlawfully. Section 1182(d)(5), however, provides that the INS may, in its discretion, parole a detainee into the United States "for emergent reasons or for reasons strictly in the public interest...." The "emergent reasons" basis for parole appears to require urgency, and Gutierrez does not actively assert this as the focus of his request for release. The more appropriate basis for parole in this case appears to be the "public interest" ground.

INS regulations implementing the public interest portion of the statute set forth categories of individuals who would "generally" qualify for release, provided the individual is not a security or flight risk. *See* 8 C.F.R. § 212.5(a)(2). The final grouping is a "catchall" category, allowing release of aliens whose continued detention is not in the public interest. *Id.* at § 212.5(a)(2)(v).

Thus, the INS regulations, as they apply here, establish a two-step analysis for determining whether an alien should be paroled. First, the District Director should determine whether the applicant's release would be in the public interest, either for one of the enumerated reasons, or for some other reason. Second, even if the applicant would otherwise qualify, the District Director should not parole the applicant if he or she is a flight or security risk.

### 1. Public Interest

Although the District Director did not frame his decision in terms of the two step analysis outlined above,[4] he did segregate his discussion of whether Gutierrez is a flight risk in a footnote. The Court therefore assumes that the text of the decision refers exclusively to the threshold question whether parole here would be in the public interest.

The District Director began his discussion of the applicable law by repeatedly emphasizing that the statutory rule is detention, and that the exception is parole.

This statement, while technically true, is of no assistance in determining whether the District Director provided a facially legitimate and bona fide reason for his decision. Indeed, it is somewhat misleading in that it implies that the statutory language itself mandates a practice of granting parole only in rare and extreme cases. As the Supreme Court has acknowledged, the INS granted parole applications as a matter of course until 1981, when it reversed its policy.

> For almost 30 years before 1981, the INS had followed a policy of general parole for undocumented aliens arriving on our shores seeking admission to this country. In the late 1970's and early 1980's, however, large numbers of undocumented aliens arrived in South Florida, mostly from Haiti and Cuba. Concerned about this influx of undocumented aliens, the Attorney General in the first half of 1981 ordered the INS to detain without parole any immigrants who could not present a prima facie case for admission. The aliens were to remain in detention pending a decision on their admission or exclusion. *This new policy of detention rather that parole was not based on a new statute or regulation.*

*Jean v. Nelson,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) (emphasis added).

It seems unlikely that for 30 years the INS was misinterpreting the statute to permit a liberal policy toward parole. Rather, as the Supreme Court indicated in *Jean,* it appears that the statute commits broad discretion to the Attorney General (and through him, to the INS) to set policy on when to grant parole. In other words, contrary to the District Director's implication, the statute itself does not mandate a harsh approach to parole, but leaves it largely up to the Attorney General.

To support his restrictive view of the parole provisions, the District Director relies heavily on the First Circuit's decision in

---

4. In its previous opinion, this Court noted that one of the specific categories of aliens generally eligible for parole—detainees who will be witnesses—was potentially applicable in this case.

Neither the District Director nor Gutierrez addressed the merits of this issue. Accordingly, the Court will not address it either.

*Amanullah v. Nelson,* 811 F.2d 1 (1987). The *Amanullah* court concluded that the legislative history demonstrated "beyond cavil that Congress consistently visualized parole as an indulgence to be granted only occasionally, in the case of rare and exigent circumstances, and only when it would plainly serve the public interest." *Id.* at 6. This Court cannot agree.

Indeed, the *Amanullah* court's conclusion that parole may be granted only when *both* emergency and public interest circumstances are present flies in the face of not only the statutory language itself, but also the legislative history quoted by the court. The parole provision states that parole may be granted "for emergent reasons *or* for reasons deemed strictly in the public interest." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). The legislative history makes clear that the disjunctive phrasing was not accidental. *See* H.R.Rep. No. 1365, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.Code Cong. & Admin. News 1653, 1706 (parole to be granted "in emergency cases ... and in cases where it is strictly in the public interest").

Nor can this Court agree with the view that the legislative history suggests an intent that the INS exercise its discretion in a "tight-fisted" manner. *See Amanullah,* 811 F.2d at 6. Certainly the statute circumscribes the discretion to parole aliens detained at the border. It does this by setting forth the criteria that must guide that discretion. But beyond this limitation, the legislative history indicates that Congress wanted to confer on the INS *"broader* discretionary authority ... to parole inadmissible aliens into the United States." H.R.Rep. No. 1365, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.Code Cong.Admin. News 1653, 1706 (emphasis added).

This view finds further support in the 1980 amendment of the statute. In that amendment Congress tightened the parole provisions with respect to refugees, requiring "compelling reasons in the public interest" before parole for those aliens would be allowed. Although this amendment was enacted while the INS parole policy was still lenient, Congress did not see fit to tighten the parole requirements generally, but only for refugees.

Perhaps the best reason, however, for not inferring a Congressional intent to mandate a harsh parole policy is the one given by the Supreme Court in 1957, when parole was routinely granted:

> Physical detention of aliens is now the exception, not the rule, and is generally employed only as to security risks or those likely to abscond. Certainly this policy reflects the humane qualities of an enlightened civilization. The acceptance of prisoner's position in this case ... would be quite likely to prompt some curtailment of current parole policy—*an intention we are reluctant to impute to the Congress.*

*Leng May Ma v. Barber,* 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246 (1957) (emphasis added).

Like the Supreme Court, this Court is loath to impute to Congress an intent to require a policy contrary to "humane qualities of an enlightened civilization." Thus, whatever discretion Congress may have conferred on the INS to set such a policy, this Court cannot agree with *Amanullah* that the intention was to require it. Accordingly, the point is not whether parole is the "exception" or the "rule," but whether the District Director exercised his discretion in this case in a permissible manner.

The heart of the District Director's decision is his desire to deter attempts to enter the United States by means of fraudulent documents and statements. He explicitly bases the denial of parole on the use of counterfeit immigration papers and the making of false statements to the INS, explaining that: "I do this not only because I do not condone applicant's conduct in this case, but also to send out a message that will discourage others from attempting such fraud." Indeed, this seems to be the sole basis for his implied conclusion that parole in this instance is not in the public interest, since the District Director disavowed "any attempt to decide whether or not applicant is eligible for legalization"

under IRCA.[5]

The District Director's stated ground for denying parole cannot support the decision for two reasons. First, by refusing to consider the likelihood of Gutierrez's eligibility for IRCA legalization, the District Director directly violated this Court's instructions to him on remand. "[T]he status of a detained alien with respect to IRCA legalization is a matter the District Director *can and should consider."* *Gutierrez,* 682 F.Supp. at 473 (emphasis added). The Court was not instructing the District Director to make a final determination on Gutierrez's legalization application, but simply to make a preliminary assessment of his chances at legalization as part of a determination of whether the public interest supports parole in this case. Such a step is actually in accordance with the cur-

rent harsh policy toward parole, as it was described in *Jean,* because even under that restrictive approach, parole would not be denied if the alien could "present a prima facie case for admission." *Jean,* 105 S.Ct. at 2995.

More importantly, IRCA itself requires such a preliminary determination. Section 1255a(e)(2) provides that an alien who makes a prima facie showing of eligibility for legalization may not be deported and shall receive INS authorization to work pending determination of his application.[6] This provision has obvious implications with respect to the authority of the INS to incarcerate aliens who appear to be eligible for amnesty. Clearly, if Congress commands that a class of individuals may not be deported[7] and must receive authoriza-

---

**5.** Notably, the District Director does not purport to base his decision on an INS regulation that precludes parole when an alien "arrives at a port of entry and applies for parole ... for the sole purpose of seeking" legalization under IRCA. In this Court's earlier decision in this case, it noted that the statutes cited in the Federal Register as the authority for this regulation do not appear to support it.

In a footnote, the District Director refers the Court to 8 U.S.C. § 1255a(a)(3)(C), apparently in the belief that this section supports the regulation. This Court can only reiterate its earlier observation. Section 1255a(a)(3)(C) provides that "[n]othing in this section shall be construed as authorizing an alien to apply for admission to, or be admitted to, the United States in order to apply for adjustment of status under this subsection." But the parole statute expressly states that "parole ... *shall not be regarded as an admission of the alien....*" 8 U.S.C. § 1182(d)(5) (emphasis added). It is difficult to understand how a statute that limits admission can justify restriction of a status that is expressly *not* admission.

**6.** Section 1255a(e)(2) reads as follows:

**(2) During application period**
The Attorney General shall provide that in the case of a alien who presents a prima facie application for adjustment of status under subsection (a) of this section during the application period, and until a final determination on the application has been made in accordance with this section, the alien—

**(A)** may not be deported, and
**(B)** shall be granted authorization to engage in employment in the United States and be provided an "employment authorized" endorsement or other appropriate work permit.

**7.** It is unclear whether the provision for a stay of deportation under section 1255a(e)(2)(B) ap-

plies in this case. As noted above, there is a distinction between exclusion proceedings and deportation proceedings. At present, Gutierrez is in exclusion proceedings. Therefore, if the word "deported" is used in the statute in its technical sense, and if Gutierrez is properly subject only to exclusion, the deportation stay may not apply.

Nevertheless, two possibilities exist that would render the provision applicable. First, Congress may have used the word "deport" in its nontechnical sense to refer to physical removal of an excluded alien from the country. Evidently, this is how the INS is interpreting the statute in this case, as counsel for Gutierrez represents that the INS has found the necessary showing and stayed Gutierrez's removal from the country. The difficulty with this theory is that a parallel provision pertaining to seasonal agricultural workers eligible for legalization explicitly stays both deportation *and* exclusion. *See* 8 U.S.C. § 1160(d)(2) (certain aliens may not be "excluded or deported."). While it may well be that this distinction between the two provisions was inadvertent (based on the erroneous assumption that aliens seeking legalization by virtue of longstanding residence would all do so from within the country), such a conclusion must overcome the presumption that the omission of a word used elsewhere in the statute is deliberate.

Second, IRCA might be interpreted to require that once an alien makes a prima facie showing of eligibility for legalization, he is no longer subject to exclusion, but only to deportation. The source of such a rule would be the continuous physical presence requirement. Since an alien who has made a prima facie showing of eligibility has necessarily shown continuous physical presence within the meaning of the statute (even if it involves a brief, casual and

tion to work in the United States, that dictate reflects an expectation that those individuals will not be locked up. If an alien is not subject to deportation and must be authorized to work, surely Congress did not intend that the INS may nevertheless keep that alien incarcerated. At a minimum, therefore, section 1255a(e) is a strong indication, if not a mandate,[8] that aliens who make a prima facie showing of eligibility for legalization should be paroled. Obviously, therefore, a parole determination with respect to a legalization applicant should include a preliminary assessment of the applicant's eligibility.

Perhaps the District Director's "comments" following his refusal to estimate Gutierrez's eligibility could be construed as an attempt to comply with this Court's order. Such does not appear to be the case, since these comments amount to the listing of two potential obstacles to Gutierrez's eligibility, with the District Director "leav[ing] it to other authorities" whether these obstacles will preclude legalization. But even if the Court interprets these remarks as preliminary determinations that Gutierrez will not succeed on his legalization application, they cannot support the decision because such preliminary determinations have little, if any, basis in law or fact.

In his comments, the District Director first cites the continuous physical presence requirement as a problem for Gutierrez, the same ground used to deny parole initially. Remarkably, he suggests that Gutierrez's exercise of his constitutional right against self-incrimination casts doubt on the "innocence" of his absence, despite noting earlier in his decision that Gutierrez had supplied evidence that his mother had experienced a medical emergency. While this Court does not mean to imply that it would necessarily be an abuse of discretion to rule that Gutierrez's departure was not "brief, casual and innocent," the exception certainly appears applicable on the facts before this Court. A three-week absence for the purpose of visiting one's mother appears to be well within the principle of "brief, casual and innocent departures" as that principle has been interpreted in the Ninth Circuit cases. *See Gutierrez*, 682 F.Supp. at 473–75. On the face of it, then, the continuous physical presence requirement does not seem to pose a problem for Gutierrez.

Next the District Director notes that an applicant excludable on certain grounds is not eligible for legalization. *See* 8 U.S.C. § 1255a(a)(4)(A). He points out that one of the three grounds on which the INS seeks to exclude Gutierrez—attempting to enter the country through the use of fraudulent documents—precludes legalization unless the INS waives that basis for denial. Waiver is authorized to do for "humanitarian purposes, [or] to assure family unity...." *Id.* at § 1255a(d)(2)(B)(i).[9] If the District Director means to imply by these observations that Gutierrez is not eligible for the waiver, this Court finds that conclusion baffling. In view of Gutierrez's long and productive residence in this coun-

---

innocent absence), his return from a nondisqualifying absence might not be considered an "entry" subjecting him to exclusion. Stated differently, the law, as it does in some other contexts, *see Rosenberg v. Fleuti,* 374 U.S. 449, 462, 83 S.Ct. 1804, 1812, 10 L.Ed.2d 1000 (1963), might treat the alien as if he never left. Under this reading, Gutierrez would not only get the benefit of the deportation stay provision upon making the requisite showing, but would be placed in deportation, rather than exclusion, proceedings.

In any event, this Court need not decide whether the deportation stay applies. The point is that, along with the work authorization provision, it reflects a congressional expectation that aliens who are likely to succeed on their legalization application should not be kept in jail.

**8.** Arguably, this provision deprives the INS of all discretion to hold an alien who makes the prima facie showing. If the work authorization provision is interpreted to mean that the INS may not prevent the alien from working, it necessarily follows that, at least to the extent incarceration prevents employment, it is proscribed.

**9.** The other two grounds on which the INS seeks to exclude Gutierrez—entry without proper documentation and entry to work without a labor certification—expressly *cannot* be used as a basis for denying him legalization. *Id.* at § 1255a(d)(2)(A).

try, the reason for his departure, and especially the fact that his family is here, including two children who are U.S. citizens, this Court is hard-pressed to imagine a better case to support a waiver for humanitarian and family unity reasons. Indeed, at oral argument, Gutierrez's counsel represented to this Court that the INS routinely provides such a waiver when, as here, the applicant's family members include U.S. citizens.

In short, Gutierrez's potential eligibility is something the Court instructed the District Director to consider, and he expressly declined to do so. If he had, this Court is of the view that the only reasonable conclusion would have been that Gutierrez's legalization application is facially valid and that he is therefore likely to be found eligible for legalization. Thus, any implied conclusion to the contrary cannot support the decision.

The second defect in the District Director's decision is his total reliance upon Gutierrez's attempt to gain admission to the country through the use of counterfeit immigration papers and false statements. He cites *Bedredin v. Sava*, 627 F.Supp. 629 (S.D.N.Y.1986) for the proposition that deterrence of fraudulent entry is sufficient ground for the denial of parole. However true this may be as a general proposition, its application here is singularly inappropriate. Gutierrez is a likely member of a group of aliens whose illegal entry into this country Congress has legislatively excused. Specifically, IRCA authorizes the INS to waive the use of fraudulent documents in effecting an entry into the United States. *See* 8 U.S.C. § 1255a(d)(2)(B)(i). The grounds for such a waiver are "humanitarian purposes, [or] to assure family unity...." *Id.*

Thus, the District Director chooses to make an example of an individual for conduct that Congress has expressly empowered the INS to waive as a ground for exclusion. To make it worse, he chooses

an individual whose case appears to present precisely the type of circumstance in which Congress expected such a waiver would be offered. Clearly such a decision cannot be squared with Congress' intent that IRCA be applied in a "liberal and generous fashion."

2. Flight Risk

Quite reasonably, INS regulations provide that even if an alien's parole is otherwise in the public interest, it should be denied if the alien is a security or flight risk. The District Director did not suggest that Gutierrez is security risk, but in a footnote he did find "a high risk of absconding." He based this finding entirely on Gutierrez's use of a counterfeit alien registration card, and alleged misrepresentations concerning the manner in which he obtained the card.[10]

This justification, thin to begin with, loses all semblance of credibility in view of the particular facts of this case. As noted, Gutierrez's prospects for legalization look quite good. After nine years of residence in this country, he has certainly laid down substantial roots. Most importantly, Gutierrez's family, including two U.S. citizen children, reside with him in the United States. In other words, Gutierrez has every reason to comply with his parole conditions and pursue his legalization application, and virtually no reason to abscond. The fact that he may have attempted to enter the country fraudulently in order to resume his life here has little or no bearing on this issue. In any event, it simply cannot support the conclusion that Gutierrez will abandon his family and the possibility of legalization in order to escape the authorities.

## CONCLUSION

■ An alien's potential eligibility for legalization under IRCA is highly relevant to a determination of whether the alien should

---

**10.** Moreover, the District Director suggested here that the "likelihood of [Gutierrez] prevailing on his legalization application is questionable." Thus the District Director appears to do in this footnote what he repeatedly asserted in the

text he was not doing: assessing Gutierrez's chances on his eligibility for legalization. As noted earlier, the facts simply provide no support for the District Director's assessment.

be paroled. Therefore, if an alien apprehended upon entry applies for legalization, the parole decision should include an assessment of the likelihood of success of the application.

■ In this case, the District Director failed to make such an assessment, despite this Court's instructions to do so. To the extent his decision might be construed to include an examination of Gutierrez's potential eligibility, it lacks factual and legal support. Similarly, his finding that Gutierrez is a flight risk is also clearly at odds with the facts before this Court. Accordingly, the decision to deny parole does not rest on a facially legitimate and bona fide reason.

In accordance with the Order of May 6, 1986, IT IS SO ORDERED.