**NOT FOR PUBLICATION**

FILED

UNITED STATES COURT OF APPEALS

JUL 18 2018

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

RIAD ABDULKADIR AYMO,

Petitioner,

v.

JEFFERSON B. SESSIONS III, Attorney
General,

Respondent.

No.   17-71159

Agency No. A208-311-853

MEMORANDUM[*]

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted June 5, 2018
Pasadena, California

Before:  WARDLAW and PAEZ, Circuit Judges, and CHHABRIA,[**] District
Judge.

Riad Abdulkadir Aymo ("Aymo"), an Ethiopian citizen who is ethnically

Oromo, petitions for review of the denial of his application for asylum, withholding

of removal, and protection under the Convention Against Torture.  Specifically, he

---

[*]      This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

[**]     The Honorable Vince Chhabria, United States District Judge for the
Northern District of California, sitting by designation.

challenges the Board of Immigration Appeals ("BIA") decision affirming the Immigration Judge's ("IJ") adverse credibility determination. He also argues that his due process rights were violated by incompetent translation during his removal hearing and by the IJ's failure to consider the totality of the evidence. We have jurisdiction under 8 U.S.C. § 1252. We conclude that Aymo's removal hearing did not satisfy the requirements of due process based on incompetent translation. Accordingly, we grant the petition and remand for a new hearing.

1.      The Due Process Clause applies to removal hearings and requires that a petitioner receive a full and fair hearing. *Perez-Lastor v. I.N.S.*, 208 F.3d 773, 777 (9th Cir. 2000). A full and fair hearing includes competent translation when the petitioner does not speak English. *Id.* at 777–78. We have held that a petitioner did not receive due process where incompetent translation caused the agency to find his testimony not credible. *Id.* To find a due process violation, we must find that Aymo exhausted this claim before the BIA, that he received incompetent translation, and that the incompetent translation prejudiced the outcome of his case. *Id.*

2.      We first conclude that Aymo exhausted his due process claim. "[W]e do not employ the exhaustion doctrine in a formalistic manner, but rather inquire into whether the issue was before the BIA such that it had the opportunity to correct [the] error." *Figueroa v. Mukasey*, 543 F.3d 487, 492 (9th Cir. 2008). Moreover, we construe pro se claims liberally for purposes of exhaustion. *Ren v. Holder*, 648

F.3d 1079, 1083 (9th Cir. 2011) (quoting *Agyeman v. I.N.S.*, 296 F.3d 871, 878 (9th Cir. 2002)). Thus, "a pro se petitioner is not required to use [] precise legal terminology." *Id.* at 1084.

Although Aymo did not use the exact legalese, "due process violation," he emphasized in his pro se brief to the BIA that he "testified honestly and truthfully before the court," "answered over 400 questions that the Immigration Judge and department attorney asked him," and "was asked the same questions multiple times and he answered the same each and every time. Court transcripts would prove that [his] testimony was sincere." Construed liberally, Aymo's pro se brief—written in a language he barely speaks—sufficiently put the BIA on notice by urging the BIA to examine the hearing transcript and by emphasizing the veracity and consistency of his testimony. Because the BIA reviewed the IJ's decision and had a full opportunity to address serious translation problems that plagued all stages of Aymo's hearing, we conclude that Aymo exhausted his due process claim.

**3.** We have no doubt that Aymo received incompetent translation during his removal hearing. We have traditionally relied on "three types of evidence which tend to prove that a translation was incompetent": "direct evidence of incorrectly translated words," "unresponsive answers" as circumstantial evidence, and "the witness's expression of difficulty understanding what is said to him." *Perez-Lastor*, 208 F.3d at 778 (citations omitted). The record is replete with all three kinds, and

3

more.

For example, as direct evidence of incorrectly translated words, the interpreter during Aymo's interview with the Customs and Border Patrol officer for his Record of Sworn Statement ("RSS") and his removal hearing interpreter both appear to have mistranslated the word "escape." The BIA found that Aymo's testimony was inconsistent with the RSS, and so not credible, because the RSS reflects that he told the immigration officer that he "escaped" from detention while Aymo testified at the hearing that he had been "released." When asked to account for the discrepancy, Aymo was certain: "I never said that I escaped."[1]

---

[1] The RSS does not appear to be an accurate record of Aymo's statements to the Customs and Border Patrol officer in other ways as well. For example, the RSS states that when Aymo was asked whether he knew his father's birthday, Aymo responded, "I don't know *her* birthday." The RSS also states that when Aymo was asked, "Are [you] mentally capable to understand and answer my questions," Aymo answered, "No." However, the interview proceeded without any further inquiry about mental capacity. As a final example, the RSS states that Aymo said Ethiopian police wanted to kill him because they thought "I had a master plan." According to the RSS, this master plan was "training the youth to turn on the Government." During the removal hearing, Aymo explained that the Ethiopian government had a "master plan" related to the development of Addis Ababa. The government's master plan precipitated protests by Oromo youth. Aymo's hearing testimony is corroborated by numerous reports, declarations, and other evidence in the record. Neither the IJ nor the BIA addressed these flaws, which raise serious concerns about the accuracy of the other statements the RSS attributed to Aymo. We have consistently held that the agency should not rely on inconsistencies between a petitioner's testimony during an informal proceeding and his testimony at a removal hearing to make a credibility determination where the statements made at the informal proceeding are neither transcribed nor recorded. *See, e.g.*, *Joseph v. Holder*, 600 F.3d 1235, 1243–44 (9th Cir. 2010); *Singh v. I.N.S.*, 292 F.3d 1017, 1023–24 (9th Cir. 2002).

4

The hearing interpreter also mistranslated the word "escape." When Aymo was asked how frequently the guards beat him during his detention, Aymo responded through the interpreter: "Yes, they were *escaping*, you know, and then coming back in two to three days, and then questioning and beating me." It is highly unlikely that Aymo said the *guards* were escaping the military camp; more likely, he said they were leaving or going and the interpreter mistranslated. "Given the difficulty of identifying incorrect translations, this evidence of an incorrect translation is persuasive." *Perez-Lastor*, 208 F.3d at 779.

The transcript is also replete with examples of the second and third categories of evidence—Aymo's nonresponsive answers and difficulty understanding what he was being asked. At least three times, Aymo said directly, "I didn't understand, Your Honor," when asked whether he understood a question or why he seemed to be changing his testimony. There are also many instances where it is apparent in context that Aymo did not understand. For example, the RSS reflects that Aymo said the Colombian police took his passport even though he testified that he lost his passport when escaping from armed thieves in Colombia. Incompetent translation interfered with Aymo's ability to explain this discrepancy. He tried to explain that the Customs and Border Patrol officer confused Aymo's experience in Colombia with the individual interviewed before him, a Kenyan man whose passport was taken by the Colombian police. The IJ pressed Aymo on how he knew what had happened

5

to the Kenyan man:

> Q: My question is before you went in you were communicating with this person?
> A: Yes, that Kenyan person was interviewed before me.
> . . .
> Q: Were you communicating with this person before that person was interviewed?
> A: Before my interview, yes, I spoke with him.
> Q: Not my question, sir. Before that person was interviewed did you communicate with that person?
> A: Yes, we were talking easily.

Although his testimony appears nonresponsive to the IJ's questions, Aymo's confusion provides strong circumstantial evidence that the interpreter failed to convey the nuance of timing to Aymo.

Finally, there are countless examples where it is clear the interpreter's less than full command of English led to any perceived inconsistencies or gaps in Aymo's testimony. For example, the BIA emphasized that Aymo testified inconsistently about the number of his times his father had been arrested, first testifying that he had been arrested twice before changing his testimony to stating that his father had been arrested three times. However, "the perceived inconsistencies on which the [agency] based [its] adverse credibility determination had more to do with the translation and transcription problems than with the credibility of [Aymo's] claims." *Li v. Holder*, 559 F.3d 1096, 1100 n.4 (9th Cir. 2009). Aymo was asked:

6

Q: And can you tell me after 1991 the next time you or your family had any involvement with the Ethiopian government?
A: In 2000 even my father was detained, yes, he was arrested. He was arrested *for two times, for the second time*.

After more questions about the 1991 and 2000 arrests, the IJ interjected to clarify Aymo's father's current location:

Q: Where is your father now?
A: He's in, arrested in jail.
Q: Your father's currently in jail? Has he been in jail since 2000?
A: No.
Q: You just told me he was arrested twice and you're now telling me he's currently in jail?
A: Since I left the country, yes, he was arrested again, new, newly.
Q: Okay, so now that you've changed your testimony, is it now your testimony he was arrested three times?
A: Yes, including this one where he is still arrested, yes.
Q: Okay. Well, your testimony is inconsistent, but okay.

Here, it was the interpreter's mistake—first stating that Aymo's father had been arrested "two times" before correcting to say "for the second time"—that led to the IJ's conclusion regarding inconsistency.

As a final example, the BIA found Aymo's testimony internally inconsistent because he "initially stated that he was beaten 2 weeks prior to his release from detention, but later stated that he was beaten at the time of his release." Again, imprecise translation is to blame. At first, Aymo testified that "two to three weeks" passed between his last beating and the day of his release. He was then asked whether he was beaten at all during the last two to three weeks of his detention, to which he replied: "During the last moments actually their beating was not, or their

7

punishment was not as harsh as it was before. It was not kicking and tying and dunking. They were just kicking me here and there at that time." This response confused the government, which followed up: "So in the two weeks before you were released you were not beaten in any way, however slight?" Aymo responded: "I was beaten slightly at that time." When the government suggested that Aymo was not answering the "simple question," Aymo said, "I didn't understand, or I didn't get the question." Aymo then reiterated, "Two weeks. Two weeks." The BIA interpreted this confusing exchange to mean that Aymo flip-flopped between testifying that he was beaten two weeks before his release and at the time of his release. In context, however, "the last moments" and "at that time" refer to the final months leading up to his release, when he was beaten less frequently than the first part of his detention, when he was beaten every couple of days. Again, any misunderstanding here is likely the result of the interpreter's inability to convey nuance, especially regarding timing.

Despite this transcript littered with overwhelming evidence of incompetent translation, the government contends that Aymo "answered affirmatively when asked whether he could understand the translator." This answer does not preclude an incompetent translation because a translator must do more than just make sure that the petitioner can understand him. For example, a translation may be incompetent because the translator relayed an inaccurate translation of a question to

the petitioner. Or it could be incompetent because the translator inaccurately translated the petitioner's answers into English. Even if Aymo understood the general gist of what was being said, there is simply too much evidence that the hearing interpreter failed to accurately convey the questions directed to Aymo and Aymo's responses, mistranslated key words, and repeatedly confused both Aymo and the IJ.

**4.** We also conclude that Aymo was prejudiced by this obviously incompetent translation. "In the case of an incompetent translation claim, the standard [for prejudice] is whether 'a better translation would have made a difference in the outcome of the hearing.'" *Perez-Lastor*, 208 F.3d at 780 (quoting *Acewicz v. I.N.S.*, 984 F.2d 1056, 1063 (9th Cir. 1993)). "This standard is onerous, but not insurmountable." *Id.* Courts have held, for example, that translation errors violate due process where "the accuracy and scope of hearing translation [was] subject to grave doubt." *See id.* (alteration in original) (quoting *Augustin v. Sava*, 735 F.2d 32, 38 (2d Cir. 1984)).

We have more than grave doubt about the accuracy and scope of Aymo's hearing translation. Indeed, from the BIA's decision, it is clear that many of the reasons for the agency's adverse credibility determination are the direct result of incompetent translation. For example, the BIA found Aymo not credible in part because his testimony appeared inconsistent with the RSS. However, as explained

9

above, the discrepancy regarding "release" and "escape" is clearly the result of incompetent translation at both the interview and hearing. The perceived discrepancy regarding how Aymo lost his passport is due to his inability to satisfactorily explain to the IJ how he knew that the immigration officer confused his story with that of the Kenyan man interviewed before him. The BIA also found that Aymo was "nonresponsive," but again, he only appeared nonresponsive to the frustrated IJ because he did not understand what was being asked of him and the IJ did not understand the translated answers. In addition, the BIA found that Aymo's testimony was "internally inconsistent" by pointing to alleged inconsistencies like the number of times his father had been arrested or the frequency of his beatings leading up to his own arrest. These perceived inconsistencies were the product of the hearing interpreter's inability to convey the nuance of timing, sequence, and numbers, not intentional obfuscation by Aymo.

The BIA also found Aymo not credible for providing vague and implausible testimony. But given how rampant the incompetent translation was in this case, there is no telling what other details Aymo could have provided that would have assuaged these concerns had he only been given the full and fair opportunity to communicate effectively. For instance, the BIA found that Aymo "could not provide clear and detailed information as to how the Ethiopian government was able to determine his identity to provide him with an identity card, given that he did not

10

have a birth certificate." The transcript, however, reveals that Aymo *tried* to explain that he used an Ethiopian identification card called a kebele ID, and that he was able to get his kebele ID without a birth certificate because the local government conducts a census in which it counts and registers residents. In garbled English, the interpreter translated: "Counting, yes, counting people, coming around and registering people on each residence. So they have our list on their file." He continued, the "[k]ebele office has personal [sic] file" which it uses to issue the ID. Because Aymo was born, raised, and living in the same kebele, "the kebele office has my name." The IJ merely dismissed this explanation, "Okay, if that's what you think is the way it's done." Instead of allowing Aymo to clear up lingering confusion, the IJ pressed on: "I mean, your stories or your explanations are not clear, but there's more things that need to be clarified."

In light of the clearly incompetent translation and the obvious impact that translation had on the agency's adverse credibility determination, we conclude Aymo's removal hearing did not satisfy due process. Accordingly, we remand to the agency with instructions to provide Aymo with a new hearing on his claims.[2] His previous testimony should not be considered as evidence at any future hearing regarding his eligibility for relief because we have serious doubt as to its accuracy.

---

[2] In light of our disposition, we do not address whether the agency failed to consider the totality of the evidence and whether the adverse credibility determination is supported by substantial evidence.

*See Perez-Lastor*, 208 F.3d at 783.  Furthermore, a new interpreter who speaks both Oromo and English should be provided at the hearing.  *Id.*  Finally, we suggest to the BIA that the new hearing be held before a different immigration judge.  *Id.*

**PETITION GRANTED and REMANDED**

*Aymo v. Sessions*, No. 17-71159

CHHABRIA, District Judge, concurring:

I join the panel's disposition, but wish to call attention to a further defect in the asylum proceedings: the conduct of Lorraine Munoz, the immigration judge assigned to Aymo's case.

Take, for example, Aymo's testimony that when he was in custody in Ethiopia, the authorities forced him to sign a letter acknowledging that he'd engaged in subversive activity and stating that he would be killed if he did it again. Judge Munoz asked: "Where's the letter, sir?" Aymo responded: "They didn't give me the letter." To which Judge Munoz replied: "Well, how would you know what you're supposed to do if you didn't get the letter, sir?" When Aymo explained: "I saw the letter when I signed [it]," Judge Munoz responded: "Well, sir, again, that doesn't seem logical." It's difficult to understand what Judge Munoz was getting at, but there doesn't seem to be anything illogical about a prisoner not receiving a copy of a forced confession. Nor is there anything illogical about a prisoner reading the confession he was forced to sign.

The transcript is filled with similarly inapt characterizations of Aymo's testimony by Judge Munoz, such as: "Well sir, you keep changing your story," or "that's incorrect, sir," or "that's kind of a circular argument," or "[y]our story is circular," or "[y]ou're not answering the question, which is very interesting, so

please answer the question." Judge Munoz accused Aymo of being either "evasive" or "perhaps inconsistent" because he could not recall the exact amount of money he had in his pocket over a year earlier when he initially fled his hometown to Addis Ababa. And when Aymo testified that he had some difficulties understanding the translator at the interview with the Customs and Border Patrol officer, Judge Munoz appeared to pressure Aymo into stating that he could understand the translator at that interview.

Consider also the exchange described in the panel's disposition between Judge Munoz and Aymo about the number of times Aymo's father had been jailed. By any objective measure, Aymo's testimony was unclear (rather than inconsistent) about whether his father had been jailed a grand total of twice or three times. Rather than seeking to clear up the ambiguity (one that had apparently been created by translation problems), Judge Munoz seemed intent solely on establishing that Aymo had contradicted himself, saying things like, "[y]ou just told me he was arrested twice and now you're telling me he's currently in jail," and "[o]kay, so now that you've changed your testimony, it's now your testimony he was arrested three times," and "[w]ell, your testimony is inconsistent, but okay."

Any one of these exchanges, viewed in isolation, may not be cause for concern. Viewed together, they suggest that Judge Munoz sought from the outset to use these proceedings not to seek the truth, but to build a record that would justify a

decision she'd already made, before actually hearing evidence, to deny the asylum application. Indeed, at the beginning of the proceedings, Judge Munoz appeared to express disdain for immigration judges in San Diego who apparently deny asylum applications less often than she does (and less often than she would prefer). It thus appears that, in addition to the incompetent translation, Aymo suffered another due process violation—denial of the right to present his case to a judge who is a neutral arbiter rather than a judge who believes her job is to deny asylum applications.