**Martin PEREZ–LASTOR, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 98–70266.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 1999

Decided March 31, 2000

Simon Salinas, Tustin, California, Celia Salinas, Law School Graduate, San Francisco, California, for the petitioner.

Mary Jane Candaux (argued) and Francis W. Fraser (brief), Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

Before: PREGERSON, NOONAN, and O'SCANNLAIN, Circuit Judges.

PREGERSON, Circuit Judge:

Martin Perez–Lastor petitions this court for review of a decision of the Board of Immigration Appeals ("BIA"). The BIA affirmed an Immigration Judge's ("IJ") determination that Perez–Lastor failed to establish his eligibility for asylum or withholding of deportation because his testimony was not sufficiently consistent, specific, and credible to meet his burden of proof. The BIA also ruled that the quality of the translation provided at the hearing did not violate Perez–Lastor's right to due process. Although the existing record does not compel us to conclude that Perez–Lastor is eligible for asylum or withholding of deportation, we find that his deportation hearing did not satisfy the requirements of due process. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## I

Martin Perez–Lastor is a citizen of Guatemala and Quiche Indian. His native language is Quiche. He entered the United States without inspection on February 20, 1993, and one year later filed an application for asylum. Two of his brothers, Avelino Perez and Tomas Perez Lastor, also reside in the United States and have been granted asylum.

In his asylum application, Perez–Lastor stated that the guerrillas harassed, threatened, and persecuted him and his family on account of political opinion and membership in a social group; that government officials detained and interrogated him, ex-

plaining that it was "for [his] own protection" and "routine work due to the guerrilla presence in the zone"; that he and his father were members of the civil defense units and stationed in Laguna Seca, El Quiche; and that his father was killed. In response to a question asking for any additional information relevant to the case, Perez–Lastor stated that he would bring additional information to his interview.

A merits hearing was held on March 11, 1997 at which a Quiche language translator was provided.[1] At the beginning of the hearing, the IJ refused to admit into the record an English language declaration signed by Perez–Lastor. The IJ reached this decision after asking the following questions to Perez–Lastor:

IJ: Mr. Perez, is this your signature on the declaration?

PL:[2] Yes.

IJ: Now, here is why I question it. You do not read or write English, do you?

PL: No.

IJ: Well, I'm not surprised nor am I being critical. It's not your native language. But as you can see, sir, your statement is in English. So here's my question. How is it that you, who do not speak English read English or write English—how is it that you were able to sign a declaration on English? How can you sign a declaration when you are not familiar with its contents?

PL: I just don't understand.

IJ: Do you understand what's in this statement in front of you now? Yes or no?

PL: No.

Immediately following this exchange, Perez–Lastor repeated twice that he could "barely understand" the translator. The IJ then instructed Perez–Lastor and the translator to talk off the record to determine whether they spoke the same dialect of Quiche. After this pause, the translator and Perez–Lastor informed the IJ that Perez–Lastor could understand the translator if the IJ spoke more slowly, enabling the translator to translate more slowly. When the IJ resumed questioning Perez–Lastor, he did not ask him again whether he understood the contents of the declaration.

The declaration that the IJ refused to admit into the record reads:

I was born in Laguna Seca, Municipality of Chiche, province of El Quiche, Guatemala. My family and I are indigenous and I have been victims of discrimination and harassment. Problems came for me since I was a child, because the military saw my family as members of the guerrillas. I can remember that I had to live hidden from place to place, and my family and I were discriminated by *ladinos* because of my origins. We were accused of being members of the guerrillas and wanted by the authorities because they claimed we were criminals. My father was killed by common delinquents in 1979.

Later, my older brother and my family from Laguna Seca to La Costa Escuintla Chontel; from Chontel to the city of Guatemala. I lived with my family in the city of Guatemala for two years and later we had to move to Antigua Guatemala. From Antigua Guatemala to Mazatenango, Suchitepequez, Zacapa, Chiquimula, Puerto Barrios, Bananera, Chimaltenango, Esquipulas. I was never a happy child because I could not have friends due to the fact that their parents called me a son of murderers. People recognized me because my mother wore indigenous clothes. In the other hand, we were victims of the guerrillas because many members of my family were killed. Guerrillas killed my uncles

---

1. At a prior hearing, Perez–Lastor requested Quiche–English translation because, although he understands Spanish, he communicates best in Quiche.

2. "PL" refers to Perez–Lastor. "TR" refers to the translator. "PC" refers to Petitioner's counsel.

Pablo Xirum, Pedro Salvador Velasquez and his wife. Soldiers wanted to kill my whole family because of the political conflicts in my country and they had thought we were guerrilla members. They took us as revolutionaries. The police and members of the civil Defense left many propaganda in many places of Laguna Seca which mentioned that my family and I were members of the E.G.P.[3] and threatened us to death.

The Civil Defense and members of the army of Guatemala killed my grandmother, Tomasa Velasquez Tecum. They left her body and the dogs, pigs and other animals ate her body. My great Aunt Xia was killed too, and we cannot recover her body because she was completely devourer by the animals. My aunt Josefa Perez and her husband were killed. She was seven months pregnant, and she was torturated by the soldiers. Soldiers took out her baby from her stomach. My relatives Diego Perez and his son of eight years of age were killed with machetes and Diego's tongue was cut out as part of the torture.

My other relatives, Pedro Perez and Juan Perez were also killed in Santa Lucia Cotzumalguapa, Escuintla of La Costa Sur. Even though I was a child, I can remember my mother's face crying and imploring God to save my life. There were many years that I had to put up with threats, harassments and discrimination that I lived. My family was separated and my brothers fled my country before me. I did not flee the country with them because one of my uncles joined the Civil Defense as protection from the military and the guerrillas and I felt a little safe, but it was impossible to continue living in my own country. I decided to flee my country and join my brothers because I would

like to live in peace without persecutions, harassments, and discriminations.... My mother continues living in Guatemala, and she still lives hidden because her life is in danger.

Perez–Lastor did not testify at the hearing about any of his relatives' deaths, except for his father's death. He stated that an uncle was harmed, but that he was not killed. He also stated that the military and civil patrols threatened him and his family and accused them of being guerrillas, but his testimony is confusing and disjointed. He testified that he received a death threat or heard a rumor that he would be killed, but could not remember the precise date and year. He also testified that he was not a member of a political party, a guerrilla group, the army, or a civil defense unit in Guatemala.

## II

The Due Process Clause applies to deportation hearings. See Hartooni v. INS, 21 F.3d 336, 339–40 (9th Cir.1994) (citing Wong Yang Sung v. McGrath, 339 U.S. 33, 49–50, 70 S.Ct. 445, 94 L.Ed. 616 (1950)). Deportation proceedings violate due process if the alien does not receive a "full and fair" hearing and suffers prejudice as a result of the inadequate proceedings. See Acewicz v. INS, 984 F.2d 1056, 1063 (9th Cir.1993). We review de novo claims of due process violations in deportation proceedings. See Antonio–Cruz v. INS, 147 F.3d 1129, 1131 (9th Cir.1998). When our review is de novo, we conduct an independent examination of the record. See Saballo–Cortez v. INS, 761 F.2d 1259, 1265 (9th Cir.1985).[4] We hold that Perez–Lastor did not receive due process at his deportation hearing because an incompetent translation prevented him from presenting relevant evidence and caused the

---

**3.** E.G.P. stands for Ejercito Guerrillero de los Pobres, or the Guerrilla Army of the Poor.

**4.** This court may consider the entire record and is not limited, as the dissent suggests, to

those facts identified by Perez–Lastor. See, e.g., Cheo v. INS, 162 F.3d 1227, 1229 (9th Cir.1998).

BIA to find that his testimony was not credible.

## A

### Competence of the Translation

█ It is long-settled that a competent translation is fundamental to a full and fair hearing. If an alien does not speak English, deportation proceedings must be translated into a language the alien understands. *See Tejeda–Mata v. INS*, 626 F.2d 721, 726 (9th Cir.1980); *see also Matter of Tomas*, 19 I. & N. Dec. 464, 465, 1987 WL 108944 (BIA 1987). Moreover, an incorrect or incomplete translation is the functional equivalent of no translation: the alien must be able to understand the questions posed to him and to communicate his answers to the IJ. *See Hartooni*, 21 F.3d at 340 (A hearing is not "full and fair" unless the proceedings are "*competently* translated into a language [the alien] can understand.") (emphasis added); *Augustin v. Sava*, 735 F.2d 32, 37 (2d Cir.1984) ("[T]ranslation services must be sufficient to enable the applicant to place his claim before the judge. A hearing is of no value when the alien and the judge are not understood."); *Gonzales v. Zurbrick*, 45 F.2d 934, 937 (6th Cir.1930) ("The right to a hearing is a vain thing if the alien is not understood.... [I]t is not unreasonable to expect that, where the services of an interpreter are needed, his capability should be unquestioned.").

█ In evaluating incompetent translation claims, this court has identified three types of evidence which tend to prove that a translation was incompetent.[5]

First, direct evidence of incorrectly translated words is persuasive evidence of an incompetent translation. *See Kotasz v. INS*, 31 F.3d 847, 850 n. 2 (9th Cir.1994) (suggesting that petitioners might have prevailed if they had "specified which, if any, word would have been translated differently, given a more competent interpreter"); *Hartooni*, 21 F.3d at 340 (stating that it is "inappropriate for [the alien's] interpreter to [ ] substitute[ ] the interpreter's words for those said by [the alien]"); *Acewicz*, 984 F.2d at 1063. Second, unresponsive answers by the witness provide circumstantial evidence of translation problems. *See id.; Kovac v. INS*, 407 F.2d 102, 108 n. 12 (9th Cir.1969); *see also Augustin*, 735 F.2d at 35. A third indicator of an incompetent translation is the witness's expression of difficulty understanding what is said to him. *See Acewicz*, 984 F.2d at 1063; *Cheo v. INS*, 162 F.3d 1227, 1229 (9th Cir.1998). All three types of evidence are present here.

█ It is extremely difficult to pinpoint direct evidence of translation errors without a bilingual transcript of the hearing. Even without that aid, the English-language transcript of Perez–Lastor's hearing provides direct evidence that the translator did not communicate the IJ's words to Perez–Lastor. The following exchange is one instance in which the translator did not repeat what the IJ said:

IJ: Where did you live in Guatemala?

PL: Before I came?

IJ: Where was the—well, before you came where did you live? Yes, let's do it that way. Before you came to

---

5. There are the four published cases in which this circuit denied an incompetent translation claim. In each case, the petitioner did not present this type of evidence. *See Kotasz v. INS*, 31 F.3d 847, 850 n. 2 (9th Cir.1994) (finding no due process violation where the translation was "at times 'nonsensical'" and where "[c]larification or repetition was at times required, but in each instance the misunderstanding was rectified to the apparent satisfaction of the parties."); *Acewicz*, 984 F.2d at 1063 (holding that "isolated passages of garbled testimony" do not violate due process); *Cheo*, 162 F.3d at 1229 (finding no due process violation where "[t]he interpreter spoke too softly for the microphone to pick up on several occasions, and had some difficulty with certain questions and answers, but the IJ intervened on each occasion to ensure that the words were translated, heard and understood"); *Hartooni*, 21 F.3d at 340 (finding no due process violation where the translator spoke broken English, but there was no evidence of a faulty translation).

the U.S. where in Guatemala did you live?

PL: I used to live in the town that you just mentioned.

The translator could not have translated the IJ's question word-for-word because the IJ did not mention any town. One possibility is that Perez–Lastor understood "Guatemala" to refer to "Guatemala City." Even if this were the case, the translator erred by not communicating the IJ's question which referred to the country of Guatemala, not the city of Guatemala. It is possible that Perez–Lastor understood "Guatemala" to refer to "Guatemala City." Given the difficulty of identifying incorrect translations, this evidence of an incorrect translation is persuasive.

There are numerous instances in which Perez–Lastor's answer is not responsive to the question he was asked. For example, when the IJ asked whether his family still lived in El Quiche province, Perez–Lastor replied, "My dad has passed away, so I don't have any dad." When the IJ asked, "Where did you live after 1983?," Perez–Lastor answered, "Was living there for that time and then we left because we were being threatened. And the guerrillas they were following us everywhere." When the INS's counsel inquired about why his family was accused of being guerrillas, Perez–Lastor said, "But we can't hide from them because they know us. And they say that, you know sometime when we find you we can just kill you. That's why I don't want to go back." When the IJ asked the same question, Perez–Lastor answered, "I was afraid because they told us they were going to kill us."[6] In every one of these examples, Perez–Lastor gains nothing by avoiding the question. Thus, the most plausible

conclusion is that he did not understand what was said to him.

Throughout the hearing, Perez–Lastor repeatedly expressed difficulty understanding the translation. The first time that Perez–Lastor alerted the IJ to this problem, the IJ halted the hearing so that Perez–Lastor and the translator could determine whether they spoke the same dialect of Quiche. Following that pause, Perez–Lastor stated that he could understand if the IJ and the translator spoke more slowly. But even after this apparent resolution, Perez–Lastor continued to express a lack of comprehension. For example, when the IJ asked, "And you were in Guatemala City until you came here? Yes or no? Yes or no?," the translator answered, "He don't understand." Moments later, when the IJ asked, "Sir, were you politically active in Guatemala? Yes or no?," Perez–Lastor answered, "I don't understand the terms you're using." When Perez–Lastor's lawyer stated, "Now, tell us why?," Perez–Lastor again replied "I didn't understand."

Moreover, Perez–Lastor never understood some questions, despite repeated questioning. For example, Perez–Lastor never understood a question about why the army and civil patrols accused him and his family of being guerrillas, even though the IJ asked him once, the government's attorney asked him once, and his own attorney asked him four times. Similarly, Perez–Lastor never understood the IJ's question about why his family took death threats seriously. While repeat questioning produced a *superficially* responsive answer on some occasions, it is by no means clear that Perez–Lastor actually understood what was asked of him. Many times, the IJ was able to extract a responsive answer only by restricting Perez–Lastor to either

6. There are other instances in which Perez–Lastor's answer is responsive, but it seems very unlikely that he understood the question. For example, at the end of the hearing, the IJ asked Perez–Lastor if there is anything else he wanted to say. According to the interpreter, Perez–Lastor replied "First of all I want to go

to Guatemala (indiscernible) for the sake of my mom." Perez–Lastor had just finished testifying about why he feared returning to Guatemala. It is not reasonable to believe that he would then state that he wants to go to Guatemala.

"yes or no." This evidence is more than sufficient to persuade us that the translation in this case was not competent.

## B

### Prejudice to the Outcome of the Proceedings

■■■ We now turn to the second question: whether the incompetent translation prejudiced the outcome of Perez–Lastor's case. An alien suffers prejudice if the violation " '*potentially* ... affect[s] the outcome of the proceedings.' " *Hartooni*, 21 F.3d at 340 (quoting *Barraza Rivera v. INS*, 913 F.2d 1443, 1448 (9th Cir.1990)) (emphasis added). In the case of an incompetent translation claim, the standard is whether "a better translation would have made a difference in the outcome of the hearing." *Acewicz*, 984 F.2d at 1063; *see also Cheo*, 162 F.3d at 1229 (finding no prejudice where inadequate translation did not "influence the outcome"); *Kotasz*, 31 F.3d at 850 (interpreting *Acewicz* to require a showing that an inadequate translation did not "influence the outcome"). This standard is onerous, but not insurmountable. *See, e.g., Kovac*, 407 F.2d at 108 (translation violated due process where the court had "grave doubt" that the hearing provided the alien "a reasonable opportunity to present his proofs"); *Augustin*, 735 F.2d at 38 (trans-

lation violated due process where, among other things, "the accuracy and scope of hearing translation [was] subject to grave doubt").

■■■ We have no doubt that "a better translation would have made a difference in the outcome of [Perez–Lastor's deportation] hearing." *Acewicz*, 984 F.2d at 1063. First, Perez–Lastor's inability to understand the IJ's questions prevented him from explaining to the IJ why he did not provide a Quiche or Spanish language version of the declaration. The same failure of translation prevented him from explaining how he understood what had been apparently translated from his Quiche to English.[7] Perez–Lastor made it clear that the IJ and translator spoke too fast for him to understand the questions, but the IJ did not repeat the questions at a slower speed. This declaration, which Perez–Lastor intended as an addendum to his application, recounts his experiences of persecution in Guatemala at the hands of the Guatemalan military and guerrillas, lists the numerous towns and cities in Guatemala where he lived, and provides specific details about eleven family members' deaths. Thus, the incompetent translation of questions relating to the declaration's admissibility "prevented [Perez–Lastor] from presenting relevant evidence." *Acewicz*, 984 F.2d at 1063.[8]

7. This court lacks jurisdiction to review the separate question whether the IJ abused his discretion in refusing to admit the declaration because Perez–Lastor did not raise that issue before the BIA. *See Rashtabadi v. INS*, 23 F.3d 1562, 1567 (9th Cir.1994); *Vargas v. U.S. Dept. of Immigration and Naturalization*, 831 F.2d 906, 907–08 (9th Cir.1987).

8. There are several ways that a petitioner may show that "a better translation would have made a difference in the outcome of the hearing." *Acewicz*, 984 F.2d at 1063. What type of evidence will successfully demonstrate prejudice depends on the BIA's reason for ruling against the petitioner. If the BIA accepts the truth of the petitioner's testimony, but concludes that the evidence presented was insufficient to establish eligibility for asylum, the petitioner can prove prejudice by showing either that he did not understand the

questions and thus could not respond to them, or that his answers to the questions were not translated correctly. When the BIA bases its denial of an asylum claim on an adverse credibility finding, as it did here, evidence that the translation caused the BIA to disbelieve the petitioner's testimony is sufficient to show prejudice. This evidence may take the form of incorrectly translated words, leading to inconsistencies or contradictions in the record. But a translation may also be so inadequate throughout in its failure to translate words with precision and to communicate the nuances of questions and answers, causing the IJ to make an adverse credibility finding based on the cumulative effect of seemingly evasive and insufficiently precise answers. In this case, it will be very difficult, if not impossible (without a bilingual transcript of the hearing), to reconstruct the dialogue and pinpoint the errors in the translation.

Second, the BIA disbelieved Perez–Lastor's testimony because he could not communicate effectively at the hearing. We have previously recognized that an adverse credibility finding may result from a faulty translation. *See Akinmade v. INS,* 196 F.3d 951, 956–57 (9th Cir.1999) (holding that inconsistencies in testimony that possibly resulted from mistranslation or miscommunication do not support an adverse credibility finding); *Vilorio–Lopez v. INS,* 852 F.2d 1137, 1142 (9th Cir.1988) (same); *Osorio v. INS,* 99 F.3d 928, 931 (9th Cir. 1996) (rejecting an adverse credibility finding based on "perceived inconsistencies" that "may have been simply the product of a language barrier or a misreading of a largely unintelligible document"). Here, three of the reasons given by the BIA for sustaining the IJ's adverse credibility finding—insufficiently specific testimony about how Perez–Lastor's sister and uncle were harmed, inconsistent testimony about the identity of his persecutors, and inconsistent testimony about where he lived prior to coming to the United States—would not have had a basis if the declaration had been admitted into the record.

The BIA interpreted Perez–Lastor's failure to testify about many events that he described in the written application and the declaration—his family members' deaths, his participation in the civil defense unit, and persecution by the guerrillas—as a sign of dishonesty. In *Augustin,* the Second Circuit faced a similar scenario: an alien, provided with incompetent translation, failed to testify to pertinent elements of his case at a deportation hearing. The court rejected the government's argument that not testifying was a strategic choice: "[I]t is difficult to fathom what strategic purpose there could be in silence." *Augustin,* 735 F.2d at 38 n. 16. We agree with the Second Circuit's reasoning, particularly where, as here, the transcript demonstrates that Perez–Lastor's attorney attempted to elicit testimony about these events but, possibly frustrated by the evident miscommunication and frequently nonsensical nature of Perez–Lastor's replies, gave up midway.

Two other reasons given by the BIA for the adverse credibility finding are also attributable to the incompetent translation. First, the BIA cited the following passage as evidence that Perez–Lastor gave inconsistent testimony about whether he was threatened in person:

PL: The reason why I left, because they keep trailing us. So they say whenever we find you, we will kill you. So that's why the main reason—that I just don't know.

IJ: Now, if somebody says, "whenever they're going to find you they're going to kill you," if they find you to tell you that, why don't they kill you.

PL: Probably, that some people that we know, that they just find that out. It's rumors and they told us that they were looking for us and they're going to kill us.

This testimony, concerning how Perez–Lastor learned of the threat to his life, is confusing and littered with grammatical errors, but it is not inconsistent. A reasonable interpretation of the translator's words, "they say," is that the translator used a figure of speech to refer to the rumor Perez–Lastor had heard, and Perez–Lastor did not assert that he spoke in person with the individuals making the threat. Perez–Lastor's response to the IJ's follow-up question clarifies that he was referring to rumors that he heard. Given the translator's less-than-fluent command of the English language, and consequent lack of precision throughout the hearing, Perez–Lastor suffered prejudice because the IJ insisted on a literal interpretation of the translator's words, and found Perez–Lastor to lack credibility because that literal interpretation contradicted Perez–Lastor's answer to the follow-up question.

Second, the translator's lack of precision may have produced the apparent contradiction about whether Perez–Lastor was a

member of a civil defense unit. Perez–Lastor alleged in his written application that he was a member of the civil defense unit in Laguna Seca, his hometown. When the IJ asked him whether he was a member of the civil defense unit in Guatemala, he replied that he was not. Guatemalans refer to "Guatemala City" simply as "Guatemala," just as "New York City" is often referred to as "New York." Thus, even if the translator repeated the IJ's question word-for-word, Perez–Lastor may have understood the question to be whether he was a member of the civil defense unit in Guatemala City. This explanation is likely, given that Perez–Lastor had just finished testifying about his residence in Guatemala City and at another place in the hearing, discussed *supra*, Perez–Lastor did not understand a question about where he had lived in "Guatemala." There is no contradiction between being a member of Laguna Seca's civil defense unit and not being a member of Guatemala City's civil defense unit.

We do not resort, as the dissent asserts, to judicial imagination when we look at the evidence of incompetent translation and draw the inference that Perez–Lastor was prejudiced. Obviously we do not know what his actual testimony was. No record of it was preserved. All we have is the garble produced by the translator. We cannot require Perez–Lastor to produce a record that does not exist. What we do have is a record cogently demonstrating why Perez–Lastor, as translated, did not make sense and so could not make a case.

Finally, we recognize that, as a practical matter, an IJ may ameliorate the damage caused by an incompetent translation by asking for "[c]larification or repetition." *Kotasz*, 31 F.3d at 850 n. 2; *see also Kovac*, 407 F.2d at 108 n. 12; *Hadjimehdigholi v. INS*, 49 F.3d 642, 650 (10th Cir. 1995); *cf. United States v. Nicholas–Ar-*

*menta*, 763 F.2d 1089, 1091 (9th Cir.1985) (stating that "due process was protected by the painstaking efforts of the immigration judge to provide a full and fair hearing" and "his sensitivity to the potential for linguistic and other confusion"). Here, the IJ did precisely the opposite. By aggressively cross-examining Perez–Lastor, the IJ exacerbated the translation problems.[9] The following exchange is representative of the IJ's style of questioning.

IJ: Are your mother and sister okay now in Guatemala City?

PL: Yes, they are because lately I've been talking to them and they say that they don't have a place where exactly they can live. Because they cannot move into a place together on account of hiding.

IJ: Well, but are they able to relocate in Guatemala City to be safe. Is that correct?

PL: It's—this is an unstable situation because they have to leave stuff everywhere, and *it's not safe for them* (emphasis added).

IJ: But they move around inside Guatemala City. Is that right? Yes or no?

PL: She say that they move from one place to another because it's just— my sister is the only one who's been hurt.

IJ: And this is in Guatemala City, they move from one place to another? Is that correct? Yes or no?

PL: Yes.

IJ: And because of the moving around they are able to be safe. Is that what you are saying?

PL: She's afraid of finding somebody that know her and ask her questions what she's doing there.

IJ: Mr. Perez, you're not answering my question. I asked not for the

---

9. We do not contend that an IJ violates due process simply by asking tough questions or assuming an unfriendly manner. *See Antonio–Cruz*, 147 F.3d at 1131. Our point is that

an IJ's style of questioning may effectively prevent a non-English speaker from communicating through a less-than-perfect translator.

thoughts of your family, but for a question that calls for an objective answer. Have they been physically harmed in Guatemala City, your mother and your sister? Yes or no?

PL: Yes.

IJ: They were physically harmed in Guatemala City? Yes or no?

PL: No.

IJ: So since moving to Guatemala City they have not been physically harmed. Is that a correct statement? Yes or no.

PL: No. Nobody.

IJ: Mr. Interpreter, does that mean yes they've been safe?

TR: Yes, they've been safe.

IJ: Okay.

While Perez–Lastor clearly stated at the beginning of the exchange that his mother and sister were not safe, the IJ continued to inquire on this point and ultimately asked the interpreter, not Perez–Lastor, whether they were safe. In short, this is not the clarifying type of questioning that *Kotasz* indicated might rectify deficiencies in the translation.[10]

### III

We reverse the BIA's ruling that Perez–Lastor's hearing satisfied due process. We remand to the BIA with instructions to hold a new hearing on Perez–Lastor's asylum and withholding of deportation claim. The testimony given at the March 11, 1997

hearing should not be considered as evidence at any future hearing regarding Perez–Lastor's eligibility for relief because the poor translation casts doubt on its accuracy. A translator who speaks the same dialect of Quiche as Perez–Lastor should be provided at the hearing. We also suggest to the BIA that the new hearing be held before a different Immigration Judge.

REVERSED AND REMANDED.

O'SCANNLAIN, Circuit Judge, dissenting:

In holding that Perez–Lastor was denied due process at his deportation hearing, the court hypothesizes that Perez–Lastor's difficulty communicating with his interpreter "caused" the BIA to conclude that Perez–Lastor's testimony was not credible. Because neither Perez–Lastor nor the record indicates how correct translations at the hearing would have refuted the BIA's adverse credibility determination, I must respectfully dissent.

### I

In order to succeed on a due process claim relating to the competence of the interpreter at his deportation hearing, Perez–Lastor must specifically demonstrate that the interpreter's performance was prejudicial to his application for asylum and withholding of deportation. In short, he must show where the interpreter

---

10. While perhaps the most egregious, this is not the only instance in which the IJ's manner of questioning does not appear to be aimed at clarifying Perez–Lastor's testimony. Another example is the testimony about his girlfriend's immigration status:

IJ: And is she like you, she's here illegally?

PL: (Indiscernible) have send for identification to find a job.

IJ: I'm just—I'm a little surprised because I—I don't think that was responsive but he seems to think that it is, so let me try again. Mr. Perez is your female friend, the one you live with, is she—did she sneak into this country with you without papers?

PL: She came illegal.

IJ: And did I understand in your last answer to say that you and your girlfriend, if you don't mind me calling her that—that you and your girlfriend sneaked into the United States because you felt that it was very important to come here to work, to get a job and work here. That's way you came here sir?

PL: Yeah, it was the main reason that we came here. But we also were persecuted out there says her and myself. That's why we came here.

From this exchange, the IJ concluded that the "main reason" Perez–Lastor came to the United States was to find a job.

failed and how "a better translation would have made a difference in the outcome of the hearing." *Acewicz v. INS*, 984 F.2d 1056, 1063 (9th Cir.1993).

Perez–Lastor has not carried this burden. He has neither indicated exactly which exchanges, if any, were mistranslated nor revealed what he otherwise would have said in the context of those exchanges that would have altered the outcome of his proceeding. In other words, Perez–Lastor has not demonstrated that there were "instances in which an incorrect or incomplete translation prevented him from presenting relevant evidence." *Id.*[1] Although we might be able to *imagine* such instances, that is not our role. If it were, there would be no point in requiring a showing of prejudice-any judge, after all, can concoct an ironclad case for asylum in the abstract. As it is, we *do* require a showing of prejudice, and Perez–Lastor must make that showing. *See Kotasz v. INS*, 31 F.3d 847, 850 (9th Cir.1994); *Hartooni v. INS*, 21 F.3d 336, 340 (9th Cir.1994) ("Because there is no evidence in this case of any specific instance where the interpreter is alleged to have erred, we cannot say that the interpretation influenced the outcome of the hearing.").[2]

## II

That Perez–Lastor's showing of prejudice is supported not by his own assertions but by the groundless conjecture of the majority is readily apparent. The majority recites first that Perez–Lastor's application was undermined because his "inability to understand the IJ's questions prevented him from explaining to the IJ why he did not provide a Quiche or Spanish language version of the declaration." *Supra* at 780. Perez–Lastor, however, has never proffered such an explanation-or even claimed that it would have been satisfactory.[3] The majority simply takes as an article of faith that Perez–Lastor had some valid explanation that he would have given but for the faulty translation. Absent the majority's baseless presumption, the record before us indicates that Perez–Lastor in fact had no idea what was in the English-language declaration (a state of affairs that is not unlikely, given that Perez–Lastor knows no English), and its exclusion was not the result of faulty translation at all.

From its pure speculation on the probativeness of Perez–Lastor's English-language declaration, the majority bootstraps another inference of prejudice that is inevi-

---

1. The court holds that the asylum-seeker can show prejudice without citing such instances. *See* supra at 780 n. 8. Hence, according to the majority, "evidence that the translation caused the BIA to disbelieve the petitioner's testimony is sufficient" in Perez–Lastor's case. *Id.*

   I fail to see any relevant difference between the majority's articulation of the petitioner's burden and the conventional one laid out in *Acewicz*. Where an incorrect translation "caused" an adverse credibility determination, the incorrect translation must either have added inconsistent elements to the petitioner's otherwise accurately translated testimony or "prevented [the petitioner] from presenting relevant evidence" by altering the actual substance of the questions and answers. No one suggests in this case that the translator *added* any information, so the majority's reformulation of Perez–Lastor's burden hardly lightens his load.

2. I do not maintain, as the majority indicates, that the scope of our review is limited to the "facts identified by Perez–Lastor." *Supra* at 777 n. 4. Our review *is* limited, however, to the actual record and allegations properly before us. Conjecture about what Perez–Lastor *might* have said falls under neither rubric.

3. Before this court, Perez–Lastor does allege (for the first time) that his negative response to the IJ's question of whether he understood the contents of his English-language declaration was really only meant to indicate that he did not understand English. This is too little too late. First, Perez–Lastor's novel assertions of prejudice in his petition for review cannot be used to reverse the BIA's decision. *See Hartooni*, 21 F.3d at 340 ("Our review is limited to the administrative record upon which the deportation order is based."). Second, Perez–Lastor still has not asserted that he actually knew the contents of the declaration when he was asked about it at his deportation hearing.

tably just as groundless. Specifically, the majority hypothesizes that the BIA impermissibly "disbelieved Perez–Lastor's testimony because he could not communicate effectively at the hearing." *Supra* at 780. This hypothesis rests on the premise that "three of the reasons given by the BIA for sustaining the IJ's adverse credibility finding ... would not have had a basis if the declaration had been admitted into the record." *Supra* at 781. Absent the majority's unfettered conjecture as to whether the declaration should have been admitted, however, there is no reason not to conclude that the BIA's adverse credibility determination rested squarely on the three inconsistencies that the BIA cited rather than on Perez–Lastor's "inability to communicate effectively." As to those inconsistencies, Perez–Lastor has never claimed, and the record does not indicate, that they are the result of any mistranslation.

The majority also attributes two other reasons given by the BIA for its adverse credibility finding to the incompetent translation. The first of these reasons was that the BIA doubted Perez–Lastor's claim that his persecutors had threatened him by saying: "[W]henever we find you, we will kill you." The BIA's incredulity derived quite reasonably from the fact that the very claim that Perez–Lastor's persecutors had delivered the threat established that they had inexplicably forgone the opportunity to carry it out. The majority rejects the possibility that Perez–Lastor was simply tripped up by his own embellishments, hypothesizing instead that his claim was rendered incredible by the poor

translation of a "figure of speech." *Supra* at 781. This is a plausible hypothesis, but Perez–Lastor has never asserted that it has any basis in fact.[4]

The second basis for the BIA's adverse credibility determination that the majority attributes to incompetent translation is Perez–Lastor's inconsistent assertion at the hearing that he was not a member of a civil defense unit in Guatemala. The majority posits that Perez–Lastor must have been referring only to civil defense units in Guatemala City rather than to civil defense units anywhere in the country. This hypothesis rests on the majority's observation that "Guatemalans refer to 'Guatemala City' simply as 'Guatemala,' just as 'New York City' is often referred to as 'New York.'" *Supra* at 781. Although the majority's observation may well be correct, there is no support for it in the record, and Perez–Lastor has never done anything more than indirectly suggest that it is true (and he did that for the first time in this court). Far more damaging to the majority's divination of prejudice here, however, is the fact that even Perez–Lastor does not attribute his inconsistent testimony about his membership in a civil defense unit to inaccuracies in translation.[5]

The majority's conclusion that incompetent translation prejudiced the outcome of Perez–Lastor's deportation hearing is thus plainly founded on neither Perez–Lastor's own allegations nor the evidence in the record. The conclusion rests instead on the majority's groundless conjecture about what Perez–Lastor would have said or actually did say. If such conjecture were all

---

4. Indeed, the majority professes to base its hypothesis merely on a "reasonable interpretation" of the statement *as it was translated. Supra* at 781. This fact alone suggests that there was no prejudice here. If the translation of Perez–Lastor's statement was not itself inaccurate, then the BIA's adverse credibility determination rested not on "incompetent translation" but on a misinterpretation of the evidence-an error for which reversal could be obtained only if Perez–Lastor were to bear a much heavier burden than he is expected to

shoulder here. *See INS v. Elias–Zacarias,* 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (requiring the petitioner to "present evidence so compelling that no reasonable factfinder could fail to find the requisite fear of persecution").

5. Perez–Lastor's counsel hypothesizes in his opening brief to this court only that "[Perez–Lastor] *probably thought* the questions were specific to Guatemala City, given the context of when they were asked" (emphasis added).

it took to establish prejudice, Perez–Lastor would not be required to show prejudice, for the reviewing judge could just imagine it for him. Perez–Lastor is required to show prejudice, however, and he has not.

### III

Because Perez–Lastor has not shown that the government-provided interpreter's incompetence prejudiced the outcome of his hearing, his due process claim cannot provide a basis for reversing the BIA. I respectfully dissent.

