**NOT FOR PUBLICATION**

FILED

UNITED STATES COURT OF APPEALS

MAR 2 2023

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| VUTORO SAUMAILAGI MUALEVU, | No. 20-73108 |
| Petitioner, | |
| v. | Agency No. A047-044-893 |
| MERRICK B. GARLAND, Attorney General, | MEMORANDUM* |
| Respondent. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted June 17, 2022
San Francisco, California

Before: BYBEE, CALLAHAN, and COLLINS, Circuit Judges.
Dissent by Judge BYBEE.

Petitioner, Vutoro Saumailagi Mualevu, is a Fijian citizen who seeks review

of an order of the Board of Immigration Appeals ("BIA") upholding a decision of

an Immigration Judge ("IJ") denying his request for deferral of removal under the

Convention Against Torture. We have jurisdiction under § 242 of the Immigration

and Nationality Act, 8 U.S.C. § 1252, and § 2242(d) of the Foreign Affairs Reform

and Restructuring Act ("FARRA"), 8 U.S.C. § 1231 *note*. *See Nasrallah v. Barr*,

---

* This disposition is not appropriate for publication and is not precedent except as
provided by Ninth Circuit Rule 36-3.

140 S. Ct. 1683, 1690–91 (2020).  We deny the petition.

## I

Mualevu was admitted to the United States as a lawful permanent resident in 1999.  In 2009, Mualevu was convicted in California state court of one count of attempted murder in violation of California Penal Code §§ 187(a) and 664 and three counts of assault with a deadly weapon in violation of California Penal Code § 245(a)(1), and he was sentenced to a total of 13 years in prison.  In 2019, he was released from state prison into the custody of the Department of Homeland Security ("DHS").  During subsequent removal proceedings, an IJ held that Mualevu's convictions constituted "aggravated felonies" that rendered him subject to removal and also rendered him ineligible for asylum or withholding of removal.[1] Mualevu has not challenged those rulings either in his subsequent appeal to the BIA or in his petition for review in this court.

The only aspect of his removal proceedings that Mualevu challenges in this court is the denial of his request for deferral of removal under the regulations

---

[1] *See United States v. Vasquez-Gonzalez*, 901 F.3d 1060, 1065–68 (9th Cir. 2018) (holding that Cal. Penal Code § 245(a)(1) is categorically a crime of violence and that a conviction under that section with a sentence of a least one year is an aggravated felony); *see also* 8 U.S.C. § 1158(b)(2)(A)(ii), (B)(i) (stating that an aggravated felony is a "particularly serious crime" that renders an alien ineligible for asylum); *id*. § 1227(a)(2)(A)(iii) (stating that an alien convicted of an "aggravated felony" is removable); *id*. § 1231(b)(3)(B)(ii) (stating that an alien convicted of a "particularly serious crime" is ineligible for withholding of removal).

2

implementing the Convention Against Torture. *See* FARRA § 2242(b) (authorizing issuance of regulations); 8 C.F.R. §§ 208.17, 1208.17. The factual predicate for that request was initially set forth in Mualevu's written application. Mualevu claimed that his family members had participated in an unsuccessful coup against the Fijian government led by George Speight; that his cousin was killed by the Fijian army during the coup; and that, given his family's participation in the rebellion, he feared being targeted if he were removed to Fiji. In addition, Mualevu also alleged that he had "grow[n] up" in Fiji "with no father" and that, as a result, he faced "a lot of hating" from people in his "village" while growing up.[2]

After Mualevu submitted his written application to the IJ, there were four in-court hearings concerning that application. At a hearing on August 5, 2019, the IJ acknowledged receiving the application. However, because Mualevu stated that he understood only a "little bit" of English and the court did not have a Fijian interpreter present, the IJ continued the hearing. Two weeks later, on August 19, 2019, the court once again did not have a Fijian interpreter available. In nonetheless proceeding to set an evidentiary hearing on Mualevu's application, the IJ repeatedly confirmed with Mualevu that he understood what that hearing would entail and that he needed to submit any documents before then. However, when

---

[2] As we note below, *see infra* at 8, Mualevu's opening brief in this court has expressly abandoned any claim that he is entitled to relief based on such alleged mistreatment by villagers.

the hearing date arrived on November 18, 2019, there was again no Fijian interpreter, and the IJ stated that it had "been very difficult finding one." The IJ then took Mualevu's "case off the calendar." Finally, on December 20, 2019, Mualevu appeared in court for a further hearing. At the outset of that hearing, the IJ stated that, despite a "nationwide search," the court had been unable to locate a Fijian interpreter. Noting that Mualevu had lived in the United States for many years and clearly had some facility in the English language, the IJ stated that she would go forward and would conduct the hearing in English. The DHS attorney noted for the record that, at the time of Mualevu's initial arrival in the U.S. in 1999, he stated in his visa application that he spoke or read "Fijian" and "English." The IJ stated that, "as will be noted throughout these proceedings, [Mualevu] has resided in the United States for approximately 20 years and has demonstrated the ability to understand English." The IJ also noted that his criminal files confirmed that he had some sufficient facility in the English language—his interview with the police was conducted in English, and his therapy sessions in prison were conducted in English. The IJ further observed that, although Mualevu had assistance from another person in completing his written application, Mualevu had handwritten the application in English himself. Accordingly, the IJ proceeded with the evidentiary hearing in English.

In explaining why he feared harm if he returned to Fiji, Mualevu first

4

reiterated that he had felt hated by the villagers because he grew up without a father. The IJ asked Mualevu why he would still have this fear as a grown man, and Mualevu stated that he still felt that he would be treated differently. During examination by DHS counsel, Mualevu stated that he had been beaten by villagers twice when he was 16, and that, as a result of the first beating, he spent at least a month in the hospital. Mualevu said that he and his grandfather reported the beating to the police, but he stated that, because no one was killed, they did nothing about it. When asked whether he could move to another part of Fiji, Mualevu responded, in somewhat rambling terms, that he just wanted a "normal life" and to "get away from those negative people."

Mualevu was also asked about the claim in his written application that he would face retaliation due to his family's involvement in Speight's coup attempt. Mualevu stated that his cousin was killed by an "army sniper" outside the Fijian Parliament building, and that his cousin shared his last name of Mualevu. He stated that several uncles of his had also been involved in the coup attempt, and he did not know what had happened to them. He testified that he feared that, if he was removed to Fiji, the Fijian government would "want me to pay the price for what my two uncles did to them." When asked to explain what his uncles had done, Mualevu stated that they "went around with the rebels and then shot a lot of the army's people." Mualevu also noted that his uncles had previously been in the

5

military before they joined Speight's rebel group. Mualevu also submitted for the record several English language articles providing additional details about Speight's coup attempt in May 2000.

When asked about relatives who still lived in Fiji, Mualevu stated that he had an aunt who with her "husband just move[d] from place to place." He stated that they moved around a lot because they "fear[ed] for their own life." When asked to explain, Mualevu said that his aunt and uncle had no "land to settle" and that the military "just do whatever they want to do." Elaborating on the latter point, Mualevu stated, "They, by the power of guns, they take things. It's a poor military, really poor, very greedy, and very aggressive." When later asked again about this aunt, Mualevu stated that she no longer lives anywhere near the village where he grew up but lives on a "different island" in another province of Fiji.

The IJ denied Mualevu's application for deferral of removal under the Convention Against Torture, and ordered him "removed to Fiji." The IJ dismissed Mualevu's reliance on what happened to his relatives, noting that "[a]nything that happened to his family happened more than a decade ago." As for the beatings by the villagers, the IJ concluded that the Fijian police's lack of response did not establish acquiescence. The IJ also stated that Mualevu could move to a "different part of Fiji" where he would be away from the villagers who had harmed him in the past.

Mualevu timely appealed the IJ's removal order to the BIA. While still in DHS detention, he submitted an 11-page pro se brief in English (which was presumably prepared with assistance from others). The BIA upheld the IJ's decision. The BIA concluded that the lack of a Fijian interpreter at the merits hearing did not violate Mualevu's due process rights because he "ha[d] not demonstrated that an interpreter in the Fijian language would have made a difference in the outcome" of his removal proceedings. Specifically, the BIA reasoned that, "even if there was a nuance of language that he could not express as well in English," Mualevu had neither "identif[ied] any specific issues that were not adequately developed," nor did he cite any "specific examples that reasonably may have impacted the outcome" of the proceedings had a Fijian interpreter been provided to him. Additionally, the BIA also found that, although he had "objected to his hearing being conducted in English," Mualevu nevertheless "was able to intelligibly and adequately respond to the questions asked."

Turning to the merits of his claim for deferral of removal under the Convention Against Torture, the BIA largely agreed with the IJ's analysis. The BIA noted that the harm to his cousin and uncles occurred "over a decade ago." The BIA also agreed that, although the Fijian police did nothing in response to the report of his beating as a teenager, such general ineffectiveness in policing did not establish acquiescence. The BIA further stated that Mualevu could move to

7

another part of Fiji, away from the villagers. Finally, the BIA noted that there was country conditions evidence indicating that the Fijian government had made effective efforts to control its security forces and to punish officials who committed abuses.

## II

In his opening brief, Mualevu expressly abandoned any claim that he is entitled to deferral of removal under the Convention Against Torture based on the alleged mistreatment he suffered from villagers when he was 16. Mualevu contends only that the agency erred in rejecting his claim for deferral of removal based on his uncles' and cousin's involvement in a failed coup attempt in Fiji in 2000, and his sole ground for challenging that determination is his assertion that he was denied due process by virtue of the failure to provide him with a Fijian interpreter at the merits hearing. We conclude that Mualevu has not shown that he was prejudiced by the lack of a Fijian interpreter and that the agency therefore properly denied deferral of removal.

A due process violation warranting relief from an order of removal occurs when the alien "does not receive a 'full and fair' hearing *and* suffers prejudice as a result of the inadequate proceedings." *Perez-Lastor v. INS*, 208 F.3d 773, 777 (9th Cir. 2000) (emphasis added). To show prejudice, the alien must demonstrate "that the alleged violation affected the outcome of the proceedings." *Lata v. INS*, 204

F.3d 1241, 1246 (9th Cir. 2000); *see also id.* ("A showing of prejudice is essentially a demonstration that the alleged violation affected the outcome of the proceedings; we will not simply presume prejudice." (citation omitted)).  Even assuming *arguendo* that the agency erred in failing to provide Mualevu with a Fijian interpreter at his merits hearing, we conclude that Mualevu failed to establish prejudice.

Mualevu contends that the failure of the IJ to provide him with a Fijian interpreter is, in effect, a failure to fully develop the record and that therefore "we may *infer* prejudice," even "in the absence of any specific allegation as to what evidence [Mualevu] would have presented" had he been provided with a Fijian translator.  *Agyeman v. INS*, 296 F.3d 871, 885 (9th Cir. 2002) (emphasis added).  The analogy to a failure to develop the record is apt, but we conclude that Mualevu has failed to show that, on this record, such an inference of prejudice is warranted.

Mualevu was repeatedly asked "broad questions" about what his uncles did, and he was allowed to respond with whatever information he wanted to provide.  *Hussain v. Rosen*, 985 F.3d 634, 645 (9th Cir. 2021).  Mualevu plainly understood *those* questions, because he provided responsive answers, in satisfactory English, concerning both what his uncles and cousins did during the 2000 coup and why Mualevu believed that he would be targeted by the Fijian government in retaliation for his relatives' roles in the coup.  In particular, Mualevu was specifically asked

9

"why is the government after your uncles?", and he said that they "did some bad things" during the coup. When asked to elaborate as to what those bad things were, he said "They, most likely they shot some of them. They went around with the rebels and then shot a lot of the army's people." When Mualevu again referred to the "bad" things done by his uncles, he was again asked, "But do you know what it is? Do you know what your uncles did that's got the Fiji government angry?" Mualevu replied, "They shot, they killed, some of the armies."[3]

In his appellate brief, Mualevu sets forth several additional details that he now claims that, if he had had an interpreter, he would have provided at the hearing. Mualevu has also supplied a declaration to support these assertions, and he asks us to supplement the record to include that declaration. The Government argues (1) that we cannot consider the additional details sketched in Mualevu's brief because those contentions were not raised before the agency, and (2) that we cannot supplement the record with a formal declaration, because we are required to "decide the petition only on the administrative record on which the order of

---

[3] The dissent highlights one particular portion of the transcript in which Mualevu made a comment on this point that is hard to follow. *See* Dissent at 2. But the assessment of prejudice must be based on the record as a whole, and the transcript includes multiple other instances in which (1) Mualevu clearly understood that he was being asked what his uncles did and why the Fijian government would be after them; and (2) Mualevu was able to provide responsive information on these points in simple English. The other transcript excerpt quoted by the dissent relates only to Mualevu's claim that he was harmed by villagers growing up, and—as we have explained—that claim has been expressly abandoned in this court. *See supra* at 8.

removal is based," *see* 8 U.S.C. § 1252(b)(4)(A). Mualevu contends that these matters may properly be considered because the BIA itself has emphasized that, in connection with such due process claims, the alien should "identify specific issues that were not adequately developed" before the IJ, and Mualevu is complying with that instruction. We need not resolve this dispute. Even considering Mualevu's articulation of the additional points that he claims he would have made at the hearing if he had had a translator, we conclude that an inference of prejudice is not warranted. *See Hussain*, 985 F.3d at 645 (considering the "testimony Hussain now claims he would have proffered" in concluding that he had failed to show prejudice in connection with his claimed due process violation).[4]

In particular, Mualevu argues that he would have added the important detail that his uncles had specifically been assigned the task of assassinating then-Commodore Frank Bainimarama, who was a "leader in the Fijian army" at the time and who, until recently, was the Prime Minister of Fiji. But given Mualevu's demonstrated ability to communicate at least basic concepts in English, there is no basis to conclude that, when asked multiple questions about his uncles' actions during the coup, Mualevu omitted this specific detail due to the lack of a *translator* at his December 2019 hearing. Mualevu obviously now thinks he should have added that his uncles were involved in a plot to kill a high government official, but

---

[4] We therefore deny the motion to formally supplement the record.

11

on this record there is no reason to believe that his failure to do so was due to the lack of a translator as opposed simply to his failure, as a pro se applicant, to think to add those additional details. *See Hussain*, 985 F.3d at 645 (holding that, where an alien is repeatedly asked open-ended questions seeking to cover the key elements of the alien's claim, arguments "that he would have provided different answers to more pointed questions are unpersuasive and do not establish prejudice" in support of a due process claim based on failure to develop the record).

Mualevu also asserts that, had he had a translator, he would have provided the further detail that "shortly after the coup attempt," the wife of one of Mualevu's uncles was "arrested, jailed, and interrogated by government forces"; that she was "released but told that if she did not provide the government with the location of her husband, she would be arrested again and jailed until she revealed his location"; and that she "fled her home" after being released, "has moved between three different locations, and continues to fear persecution by the government despite her husband's . . . continued absence." As noted earlier, Mualevu did testify that his aunt had moved around in part because of fear of the military's abuses, but he did not tie her fear specifically to her husband's participation in the coup attempt. Once again, we see no basis to conclude that the omission of this detail was due to the lack of a translator as opposed to Mualevu's failure to think to mention it. Moreover, the only specific claim of mistreatment of

12

his aunt that he now asserts is one that occurred immediately after the coup, when the government was looking for his uncle. This additional detail would not affect the conclusion that "[a]nything that happened to his family" in Fiji "happened more than a decade ago."

Finally, Mualevu contends that, if he had had a translator, he would have explained his view that it is "well-known" that Fiji's security forces engage in torture and that they maintain "watch lists" of opponents and critics of the government. But the record already contained substantial documentary evidence concerning the shortcomings of the Fijian government and the internal problems in Fijian society (some of it supplied by Mualevu himself), and we see no basis to conclude that the generalized opinions offered by Mualevu—who had not lived in Fiji for 20 years—would have materially altered the balance of the evidence on this subject.

Accordingly, we conclude that Mualevu has failed to establish prejudice due to the lack of a translator at his hearing. The agency therefore properly denied his request for deferral of removal under the Torture Convention

**PETITION FOR REVIEW DENIED.**

13

BYBEE, J., dissenting:

I would grant Vutoro Saumailagi Mualevu's petition and return this case for a "full and fair hearing" before the immigration judge ("IJ"). *Perez-Lastor v. I.N.S.*, 208 F.3d 773, 777 (9th Cir. 2000) (internal quotations and citation omitted). The record below demonstrates that he was denied due process.

Mualevu is not fluent in English and required a translator during his immigration proceedings. During his first scheduled appearance before an IJ in May 2019, Mualevu requested a Fijian translator and the IJ rescheduled him for a later master calendar in order to provide for one. In June and July 2019, Mualevu appeared before the IJ for initial removal proceedings where a Fijian interpreter was provided. At Mualevu's August 5, 2019 merits hearing, the IJ continued his case due to the lack of an interpreter, explaining "I don't want to go through any more proceedings with you without an interpreter." On August 19, 2019, the IJ again continued the case for lack of an interpreter. The IJ continued the case for a fourth time in November 2019 for the same reason and assured Mualevu that "we'll wait until we get you [an interpreter], sir," but indicated that she "want[ed] to finish this case before the end of the year." In December 2019, however, the IJ decided to proceed with Mualevu's merits hearing despite failing to secure an interpreter; she explained that after "a nationwide search . . . [t]here is no qualified Fijian interpreter." Before rendering her oral decision, the IJ noted that the hearing

was conducted in English without the assistance of an interpreter. She cited as evidence that Mualevu "does speak and understand English" the following: his birth certificate being in English; his application for an immigrant visa where Mualevu indicated "some facility in English"; his presence in the United States since 1999; his period of custody in California prison; and the court's periodic inquiries into whether Mualevu understood what was going on during the hearing. Mualevu protested repeatedly that "I need a translator."

Despite the IJ's confidence that Mualevu understood the proceedings, the hearing transcript is replete with examples demonstrating that he lacks fluency in the English language and struggled to understand and respond to questions in English. I'll provide two illustrative examples. When asked why his uncles had shot some members of the Fijian military, Mualevu answered:

> Well, they, it was, go against the army and they started never getting in the rebels' way. So, they have to make the army to listen, to pay attention. This is going to happen again and again if you guys never come together. And they never come together. It was, they started, and nobody got found, nobody, and it was all gone.

And, when asked what would prevent Mualevu from living in a different area than where he was originally from—where Mualevu testified he had been beaten and feared returning—he responded:

> I just want to be successful in life, through bad things. Just want to be

2

happy and enjoy that I had a life. I want to be a better person. I want to be great. I know the negatives and the positives, learned my lesson. I just want to enjoy life and be successful and get away from those negative people. That's it. I just want to live a normal life.

We have held that when an "alien does not speak English fluently, the presence of a competent interpreter is critical to the fairness of a hearing." *Kotasz v. I.N.S.*, 31 F.3d 847, 850 n.2 (9th Cir. 1994). Nonetheless, the IJ proceeded without a translator and issued a decision predicated on Mualevu's testimony despite his apparent difficulty in understanding and responding to questions in English. In doing so, the IJ failed to fully develop the record, and Mualevu was either presumptively or specifically prejudiced. *See Agyeman v. I.N.S.*, 296 F.3d 871, 885 (9th Cir. 2009) (to provide a full and fair hearing, an IJ has a duty to fully develop the record).

Where, as here, the IJ fails to fully develop the record by requiring a petitioner to proceed in English without a translator, a presumption of prejudice should apply. As we have recognized, an alien is not required to "produce a record that does not exist." *Agyeman*, 296 F.3d at 885 (quoting *Perez-Lastor v. I.N.S.*, 208 F.3d 773, 782 (9th Cir. 2000)). "Rather, we may infer prejudice in the absence of any specific allegation as to what evidence . . . would have [been] presented" if the IJ had fulfilled her constitutional duty to fully develop the record. *Id.*

3

Even assuming a showing of specific prejudice was necessary in this case, Mualevu's claims are far from frivolous and the petition should be granted. A due process violation causes prejudice if "the violation potentially affects the outcome of the proceedings." *Agyeman*, 296 F.3d at 884 (cleaned up). Mualevu contends that with the assistance of an interpreter he would have provided important details about his Fijian family's involvement in an attempted coup, the government's attempts to get information on those involved from other family in Fiji, and the ways in which the government uses physical interrogation tactics. I would give Mualevu the opportunity to provide a fully developed record for the IJ and the BIA to determine the merits of his claim.